15 Cal.2d 134 (1940)
In the Matter of PACIFIC COAST BUILDING-LOAN ASSOCIATION, OF LOS ANGELES, CALIFORNIA (a Building and Loan Association). LOUIS C. DRAPEAU, Building and Loan Commissioner, etc., Petitioner and Respondent; H. P. DRAKE et al., Claimants and Respondents,
v.
CUSTODIANS OF TELLURIDE ASSOCIATION et al., Appellants.
L. A. No. 16540. 
Supreme Court of California. In Bank. 
February 8, 1940.
 W. R. Waldo, Drumm, Tucker & Drumm, Albert Sidney Brown and Carpenter, Babson & Fendler for Appellants.
 L. K. Vobayda, in pro. per., James C. Ingebretsen, Robert Lee Collins, John C. Campbell, Otto A. Ehlers, Franz R. Sachse, Jess E. Stephens, H. L. Carnahan and J. W. McKinley for Respondents.
 SHENK, J.
 This is an appeal from an order of the superior court instructing petitioner and respondent, Building and Loan Commissioner of this state, as to the manner of payment of claims against Pacific Coast Building-Loan Association, in liquidation.
 On January 11, 1932, the association being insolvent, the commissioner took possession of its business and assets, for the purpose of liquidation. On July 11, 1932, the Superior Court of Los Angeles County, the principal place of business of the association, upheld the action of the commissioner. He thereupon began to liquidate the assets and pay claims.
 On March 25, 1937, the commissioner petitioned the superior court for instructions with reference to the payment of claims. It appeared that all general creditors had been paid in full; that holders of investment certificates had been paid *138 principal and interest up to the time the business was taken over; that holders of membership shares had not been paid anything as yet, and that a substantial surplus remained in the hands of the liquidator. The holders of investment certificates demanded payment of interest on their claims for the period of liquidation. The holders of membership shares demanded that the principal of their claims be paid before any such interest was given to the investment certificate holders. In response to the commissioner's request for advice, the court ruled that the membership shareholders were creditors of the association; that no interest was payable to general creditors or investment certificate holders for any period since the commencement of liquidation until the principal sums of the claims of membership shareholders should be paid.
 This appeal was taken by representatives of the investment certificate holders.
 In figures, the facts are as follows: The membership shares, held by 4,400 owners, amounted to $3,420,563.07, $1,113,809.92 being pledged for loans, and $2,306,693.15 being "free" or unpledged. The investment certificates had claims in the sum of $3,556,897.35. General outside creditors had claims amounting to $5,950.90. It is estimated that only about $1,800,000 of additional assets will be recovered, with the certainty, therefore, that even without payment of interest to the investment certificates, the funds will be insufficient to pay membership shares in full.
 The theory of appellants may be summarized as follows:
 (1) Investment certificate holders are creditors of the association, entitled to the same preferential treatment as general creditors.
 (2) Membership shareholders are stockholders, much like those of an ordinary business corporation; hence they are not creditors.
 (3) Creditors of a corporation in liquidation are entitled to be paid in full on their claims before stockholders receive any payment on account of their shares.
 (4) Payment in full includes interest during the period of liquidation and up to the time of payment. Whether such interest is claimed at the legal rate, or at the rates specified in the individual certificates (5 per cent, 6 per cent and 7 per cent) is not entirely clear. *139
 It is conceded that the investment certificate holders are creditors; the nature of their investment, as will hereinafter appear, is plain. It may be further granted that membership shareholders have some voice in the affairs of the corporation which the holders of investment certificates do not have. Yet these concessions do not solve the problem, for they do not positively define the nature of the relationship of the membership shares to the corporation. [1] One may, with assurance, declare that a common stockholder of an ordinary business corporation is not a creditor of the corporation, and his claim would be subordinated to those of creditors. (Greva v. Rainey, 2 Cal.2d 338 [41 PaCal.2d 328].) But to conclude from this fact that a membership shareholder of a building and loan association cannot be a creditor in any sense is to ignore the peculiar character of such shares. Building and loan associations have grown rapidly in the past few decades, and have developed widely differing types of organization and stock structure. Membership, management, methods of raising capital, indeed, all their operations are so diverse that it is impossible to speak with precision of the relationships unless discussion is confined to a particular association formed under the laws of a single state. (See, Sundheim, Building and Loan Association, p. 12 et seq.; Fidelity Savings & Loan Assn. v. Burnet, 65 Fed.2d 477, 479 [62 App. D. C. 131].) Even in our own state, as will appear, we must avoid hasty conclusions drawn from cases dealing with associations formed under old laws different from those in force today. Accordingly it is necessary to examine the organization and structure of this particular association in the light of the governing statutes, articles of incorporation, and by-laws. When we do we find that the membership share is a hybrid affair, the member having some of the characteristics of a stockholder and others of a creditor. Whether those elements which make him a creditor are of sufficient substance to warrant the procedure adopted by the lower court in this case is the question to be answered by our examination.
 [2] The association was incorporated in May, 1925, under the provisions of sections 634 and 648a of the Civil Code. These and other sections of the code dealing with building and loan associations were superseded in 1931 by the Building and Loan Association Act. (Stats. 1931, p. 483; Deering's Gen. Laws, Act 986.) Except as noted herein no material *140 changes were made in the prior law by the new act which would affect this case; and the parties concede that the act governs these liquidation proceedings.
 [3] The said sections 634 and 648a of the Civil Code, as amended in 1907 and 1909, established a new type of permissible capital structure for building and loan associations. The principal characteristic of the new plan was the provision for a guarantee capital stock, set apart as a fixed, non-withdrawable capital, to "protect and guarantee all other stockholders and creditors against any loss". (Civ. Code, old sec. 634 [d]; see, also, Building and Loan Association Act, sec. 4.01.) Such guarantee stock, or as an alternative, a certain fixed reserve fund, must be issued in certain percentages of the amount of outstanding investment certificates. (Civ. Code, old sec. 634 [e]; Building and Loan Association Act, sec. 5.03.) [4] The theory behind this plan is that the other shares and certificates will receive a more or less fixed reasonable rate of return, with the guarantee stock (or reserve fund) as a protection, and that those who supply the capital for the guarantee stock will receive the entire surplus over the amount necessary to pay the fixed return to the other investors, and will also control the business. In brief, the guarantee stockholders take the risks, manage the affairs, and receive the profits in excess of the fixed charges. Only a few jurisdictions permit this type of association to be formed. (Sundheim, Building and Loan Associations, p. 18.)
 [5] Guarantee stock was authorized by our statutes in the following manner: Under section 634 of the Civil Code, an existing association could issue the new form of stock. Under section 648a, enacted in 1909, the corporation could, if desired, be formed with guarantee stock alone, thereafter obtaining working capital by issuance of membership shares, units or certificates. Pursuant to the statutory authority of section 648a, the present association was incorporated with guarantee capital stock only, and it then raised its working capital by issuance of membership shares and investment certificates. These will now be analyzed, as their nature appears in the statutes, articles and by-laws.
 [6] First, guarantee capital stock was authorized at $100 per share, the total authorized amount being 5,000 shares. The said stock is non-withdrawable, and no loans can be made upon it. (Civ. Code, old sec. 637.) It must be kept *141 unimpaired, guarantees losses, and is assessable and liable for debts. (Civ. Code, old sec. 634 [d]; see, Act, secs. 4.01, 7.01.) A majority of the board of directors of the association (5 out of 9 members) must be selected from the holders of guarantee stock, and officers are chosen by this board. No action concerning financial matters can be taken except by affirmative vote of a majority of the whole board. In liquidation, after all claims and expenses are paid, a majority of the holders of such stock may have the surplus delivered to the association and obtain title again, free from the commissioner's claim. (Act, sec. 13.16.)
 [7] Second, membership shares were authorized. These are either full paid shares, prepaid shares, or instalment shares, all with a par value of $100. The instalment shares pay dues of 50 cents per month on each share until the payments and accrued dividends amount to $100. Dividends are paid or credited to the shareholders at rates fixed by the board of directors, there being no guaranteed rate. They have no further right to participate in profits, if such a dividend is specified. They have the right to borrow from the association and pledge their shares as security. The shares are nonassessable. (Act, sec. 7.07.) They are withdrawable (Act, sec. 3.02), and are subject to forced retirement in the discretion of the directors. (Civ. Code, old sec. 635; Act, sec. 3.04.) They (the members) are permitted to participate in meetings and vote their shares. The by-laws declare that membership shareholders "are members of the corporation, with all the rights, power and privileges incident thereto, including a right to vote at all meetings of the shareholders and members--one vote for each share--and are subject to the same restrictions and liabilities". However, it appears to have been the practice for these members at the time of application for membership shares to execute proxies in favor of the secretary.
 [8] The third classification was the investment certificate, a type of unsecured note or debenture, used by the association in raising funds from time to time, as needed. (See, Act, sec. 5.01.) The purchasers pay a certain sum and receive a certificate in a form similar to a promissory note, with attached interest coupons. The terms of the notes vary from one to three years. No dividends are paid, but a fixed sum as interest as specified, ranging in different instances from 5 per cent to 7 per cent. The certificates may be *142 pledged for loans and are subject to enforced retirement or redemption. (Act, sec. 5.06.) The holders have no voice in management, do not participate in the business affairs, and the by-laws provide: "Holders of either form of these Investment Certificates are not members of the corporation and have none of the rights, powers and liabilities incident thereto." They are immune from liability for assessments or debts. (Act, sec. 5.01.) They have a special priority in the event of liquidation; they are "entitled upon liquidation of an association to receive payment in full before any payment or distribution shall be made to shareholders or stockholders". (Act, sec. 5.01.)
 [9] It is apparent from the most cursory examination of the above that a sharp distinction exists between guarantee stock and membership shares. The definitions in the statute make this distinction at the outset. "Shareholder" is synonymous with "member" and means the holder of "shares". "Stockholder" means the holder of "stock". "Shares" refers to "withdrawable shares" which constitute "membership shares". "Stock" means "guarantee stock". (Act, sec. 1.01; see, also, Civ. Code, old sec. 648a.) The guarantee stock, as already pointed out, is permanent, non-withdrawable, assessable, and liable to claims of creditors. None of these things is true of membership shares. The guarantee stockholders take the major risk, and in return have the controlling voice in management (since a majority of the board must be selected from their group). They receive all the profits over the moderate return by way of interest or dividends going to others. The very name of the guarantee stock discloses a primary purpose, the creation of a fund for the protection of others who invest in the association, including membership shareholders and investment certificate holders. In liquidation, their rights are expressly subordinated, not only to investment certificate holders, but also to membership shareholders. (Act, sec. 13.16.) [10] These guarantee stockholders closely resemble the common stockholders of an ordinary business corporation, in both powers and liabilities, and bear no resemblance at all to the traditional members of a building and loan society or association. The membership shares, however, have none of these characteristics, but instead are of the familiar type found in the typical building and loan association. The power of the *143 member to withdraw, and the power of the association to compel retirement, are significant indications of the difference between ordinary common stock and guarantee stock on the one hand, and membership shares no the other.
 Further study discloses a marked similarity between membership shares and investment certificates. The declared purpose of each type is to secure working capital, which means, it would seem, operating funds rather than an original stated capital or capital stock. Neither is assessable, neither is liable for debts. Both are withdrawable, and both are subject to forced retirement. Both may be pledged for loans. Both are protected by the guarantee stock, and such stock is subordinated to both in the payment of claims on liquidation. There is an obvious legislative purpose to treat these two forms of investment in most cases as substantially similar in so far as the rights of the investors are concerned.
 [11] What then are the differences between membership shares and investment certificates, upon which appellants rely? There are only three consequence. First, the return on the investment differs. Investment certificate holders receive a fixed rate of interest. Membership shareholders are entitled only to dividends as determined by the board of directors. But such a dividend must be specified, or they share in the profits. In practice, dividends are specified. The result is some more or less fixed return, in both types of investment, varying not more than a few per cent. Second, the investment certificate holders have no voice in the management of the association. The membership shareholders may attend meetings and vote. This distinction is less impressive when we consider the fact that the majority of the board, with full control over financial matters, must be guarantee stockholders, so that in truth the membership shareholders only help select the management, but have no genuine power of management themselves. Third, the investment certificate holders have a liquidation preference. They are entitled to have their claims paid in full before any payments are made to other kinds of shares (except in the case of exchangeable shares under late legislation).
 We should not be led astray, when observing these differences, and come to the hasty conclusion that they determine a point which, upon further consideration, has nothing to do with them. The difference in voting rights, for example, is *144 not conclusive. Suppose the certificate holders were themselves given a vote. Would this outweigh all the other factors which make them creditors and itself turn them into stockholders? Obviously it would not. Nor does the liquidation preference of investment certificates have the effect claimed by appellants. The investment certificate holder is without doubt a preferred creditor, but this does not make the membership shareholder any less a creditor, though an inferior one. In short, it appears that the membership shares are fundamentally similar to the investment certificates, and the differences noted are not of such significance as to overcome this similarity, in respect of the rights of the investor against the association. We conclude that the membership shareholders are creditors of the association.
 The cases relied upon by appellants to deny the status of creditors to holders of such shares are all distinguishable.
 Groover v. Pacific Coast Sav. Soc., 164 Cal. 67 [127 P. 495, Ann. Cas. 1914B, 1261, 43 L.R.A. (N. S.) 874], was an old form of association, incorporated prior to the statutes of 1891 governing building and loan associations, and whether its structure bore any substantial resemblance to that of the association here involved does not appear. But aside from this, the issue in the case was whether upon insolvency borrowing instalment shareholders should be given a credit on their debts in the amount of payments made on their stock. It was held that to permit this would be to discriminate against nonborrowing members and outside creditors, and to violate the equitable principle of equality. In the course of its opinion the court referred to the distinction between a stockholder and a borrower, and held that the dual position of the borrowing stockholder could not be ignored. In the present case many of the borrowing shareholders were credited with their share payments, and no complaint was made as to this action. The problem before us here, as to the respective rights of membership shareholders and investment certificate holders, is one upon which the Groover case throws no light. Not only was the controversy there over a different issue, but it does not appear that there were any investors in a position comparable to that of the investment certificate holders.
 Pacific Coast Sav. Soc. v. Sturdevant, 165 Cal. 687 [133 P. 485, 49 L.R.A. (N. S.) 1142], a case involving the *145 same association as the Groover case, was concerned solely with the question whether stockholders whose stock had matured and who had given notice of withdrawal and demand for payment prior to insolvency, were entitled to priority over other stockholders, in liquidation. The court held that the principle of equality among members applied; that all should be treated alike, without preference; and that the notice of withdrawal and demand did not change them into general creditors with a right to preferential treatment. Again it must be emphasized that the conflict there was between members or stockholders, and no class of investment certificate holders existed. As for the general language of this and the preceding case, far from supporting the position of appellants, it is actually contrary thereto, for it stresses the principle of equality among those similarly situated. As we have already shown, the marked similarity between membership shares and investment certificates would, under the language of both these cases, suggest the denial of preferences rather than the giving of them.
 Equally distinguishable are several federal cases cited by appellants. In Fidelity Savings & Loan Assn. v. Burnet, 65 Fed.2d 477 [62 App. D. C. 131], an association with both guaranty stock and membership shares, the only question was whether the normal return paid to the membership shares was "interest", deductible under the Revenue Act of 1921, or "dividends" which would be nondeductible. The court concluded that the shareholders were not creditors receiving interest, but stockholders receiving dividends, and that these were not deductible payments. There is no reason to dispute the soundness of this conclusion, for the court was dealing with a solvent association, and the question of rights in liquidation was not at all involved. As will hereinafter be seen, the court expressly recognized that an entirely different view is properly taken upon insolvency. In Harry E. Jones, Inc., v. Kemp, 74 Fed.2d 623, and Barrymore v. Kemp, 69 Fed.2d 335, the sole question was whether investment certificate holders were entitled to parity with general creditors in payments on liquidation. There was no consideration given to the status of membership shareholders in either case.
 On the other hand, there are several decisions which have, in various situations, recognized that members or shareholders *146 of an insolvent association in liquidation may be treated as creditors.
 In re Western States Building-Loan Assn., 50 Fed.2d 632, was a bankruptcy proceeding, and the question was whether certificate holders or shareholders were creditors with provable claims. Emphasizing the right of withdrawal, the court said: "It is to be noted that the contract relationship established does make the association the debtor of its shareholder", and went on later to explain: "When an association is forced into liquidation, and as a consequence is in a position no longer to fulfill its obligations, it must be that the debt matures, and that, in whatever fund is realized upon a sale of the assets, the debtor or shareholder is entitled to participate." In Fidelity Savings & Loan Assn. v. Burnet, supra, strongly relied upon by appellants, the Western States case is considered and distinguished, the court conceding that upon insolvency, the shareholder gains the rights of a creditor. Likewise, the case of In re Guaranty Building & Loan Assn., 49 Fed.2d 776, while denying shareholders the right to institute bankruptcy proceedings, recognizes that "they become invested with the character of creditors upon the adjudication in bankruptcy". (See, also, Sundheim, supra, sec. 193; Rummens v. Home Savings & Loan Assn., 182 Wash. 539 [47 PaCal.2d 845, 100 A.L.R. 570]; Mott v. Guardian Bldg. & Loan Assn., 140 Or. 489 [14 PaCal.2d 447].)
 [12] From the foregoing discussion, it must be concluded that the membership shareholders herein are to be treated as creditors of the insolvent association in liquidation. With this established, the determination of the precise point at issue becomes a relatively simple matter. We are not concerned with the rights of general outside creditors, which are universally conceded to be prior to those of members. [13] Our only problem is to determine the rank of the claims of shareholders and investment certificate holders. The statute expressly places the investment certificate holders in a more favorable position than the membership shareholders; but this does not warrant the courts in still further extending the preferential position established by statute. The law gives preference in the matter of payment of the claim, which, reasonably interpreted, means the principal sum due; and this claim has already been satisfied in full. As to interest the statute is silent. And, in view of that silence, the statutory *147 preference should logically end at that point, and the problem must then be solved in accordance with the usual equitable principle governing liquidation, namely, the principle of equality among creditors. [14] Stated broadly, the rule is that one creditor is not entitled to payment of interest on his claim in receivership, bankruptcy, or other form of liquidation, after the commencement thereof, where the assets are not sufficient to pay the principal of all claims in full. (See, Greva v. Rainey, 2 Cal.2d 338 [41 PaCal.2d 328]; Glenn on Liquidation, secs. 488, 510.)
 The above rule was announced by this court recently, upon a full review of the authorities, in Greva v. Rainey, supra. A bank was in liquidation and the respective rights of stockholders and various depositors were involved. This court held first that the depositors, as creditors, were entitled to payment of not only the principal of their claims but interest during liquidation, before any payments should be made to stockholders. This distinction between the rights of creditors and stockholders is well settled, and as applied to the present case, would mean that any of the various kinds of creditors of the association would be entitled to interest as against the guarantee stockholders. The second holding in the Greva case was that as to the different classes of depositors, that is, those in the commercial and those in the savings departments, neither should receive interest until payment of the entire principal sum to all. We said (p. 346): "The decisions ... are uniform to the effect that in so far as is possible the creditors of an insolvent debtor must be treated on a basis of equality ... That, indeed, is the premise from which springs the rule that interest ordinarily will not be computed nor paid from the date of the suspension of business, or commencement of the receivership or other liquidation procedure. Therefore, there being but one debtor involved, all creditors are entitled to equal consideration except where the statute expressly provides otherwise, and then only to the extent provided." And quoting from People v. American Loan & Trust Co., 172 N.Y. 371 [65 N.E. 200], we said further (p. 347): "As the statute does not say that preferred claims shall be paid with interest to the date of payment, the courts should not, because the claims of substantially all the creditors, both preferred and unpreferred, were alike in origin, for they were created by the deposit of money; and preference in derogation of the common law should not be *148 extended by construction beyond the express command of the statute."
 [15] It follows that the lower court correctly instructed the respondent Building and Loan Commissioner as to the apportionment of funds in payment of claims against the association.
 The order is affirmed.
 Edmonds, J., Gibson, J., Carter, J., and Waste, C.J., concurred.
 CURTIS, J.,
 Dissenting.
 I dissent. I take issue with the following statement found in the early part of the majority opinion: "The theory behind this plan [the plan under which said association was organized] is that the other shares [membership shares] and certificates will receive a more or less fixed reasonable rate of return, with the guarantee stock (or reserve fund) as a protection, and that those who supply the capital for the guarantee stock will receive the entire surplus over the amount necessary to pay the fixed return to the other investors, and will also control the business. In brief, the guarantee stockholders take the risks, manage the affairs, and receive the profits in excess of the fixed charges." The opinion is based solely upon this theory. The substance of the entire theory is stated in the last sentence of this statement. This statement, in my opinion, does not correctly set forth the respective rights, duties and obligations of the guarantee stockholders and the holders of membership shares.
 In the first place, the guarantee stockholders do not take the risks of the association alone, but assume them only in part and jointly with the holders of membership shares. If the association fails to make any profit, after paying the general running expenses of the association and the interest due on the investment certificates, the holders of membership shares, like the guarantee stockholders, receive no return on their investment. If there is a surplus after paying these expenses and interest, this surplus may be paid out in dividends to both the guarantee stockholders and the holders of membership shares. The holders of membership shares are entitled to dividends at the same rate as is allowed the guarantee stockholders. The only risk assumed by the guarantee stockholders, not assumed by the membership shareholders, is *149 that the stock of the former is liable for assessment and to creditors.
 The claim that the guarantee stockholders have the controlling voice in the management of the association is based upon a provision of the by-laws that five out of nine directors must be guarantee stockholders, but these five directors, as well as the other four directors, are elected by the combined votes of the guarantee stockholders and the holders of membership shares, each entitled to one vote. From the character of an association organized like the Pacific Coast Building-Loan Association, it is obvious that the number of membership shares would exceed by far the guarantee stock. It was so in the present association as the holders of membership shares largely predominated over the guarantee stockholders in the proportion of over ten to one. There were 2,755 shares of guarantee stock, and over 34,000 membership shares outstanding at the time this association was taken over by the commissioner. The shareholders, therefore, were able to control the election of the board of directors, who in turn managed the affairs of the association. While it is true that five of the nine directors were required to be holders of guarantee stock, if they owed their position to the vote of the holders of membership shares, it is only reasonable to assume that they would carry out the wishes of the power that elected them. Furthermore, there were twenty-nine holders of membership shares, who were also holders of guarantee stock. There was nothing to prevent the membership shareholders from casting their votes for at least five of these holders of both guarantee stock and shareholder stock, and together with the four that they might elect from their own membership, elect a board of directors consisting wholly of holders of membership shares. In such an event, which is not only possible but probable in the management of an association with a corporate structure like the Pacific Coast Building-Loan Association, the management of the association would be in the entire control of the holders of membership shares. It is not correct, therefore, to say that the guarantee stockholders manage the affairs of the association. They may do so only with the consent and approval of the holders of membership shares. The latter are legally the controlling factor in the management of the affairs of the association. The majority opinion refers to the custom of holders of membership shares to execute proxies in favor *150 of the secretary, but they were under no legal obligation to execute such proxies, and they might recall them at any time.
 Neither can it be correctly said that the guarantee stockholders receive the profits in excess of the fixed charges. The fixed charges are the expense of conducting the association and the interest on borrowed money, including the interest on the investment certificates. After these charges have been paid, the balance, if any, belongs to the stockholders, both guarantee stockholders and membership shareholders, and may be paid to them in dividends. The dividends are declared by the board of directors, and must be paid equally on the stock, both of the guarantee stockholders and that of holders of membership shares. This dividend is not a fixed charge, but is only payable by resolution of the directors and when declared is paid alike to both classes of stockholders.
 It is apparent, therefore, that the distinction which the majority opinion makes between these two classes of stockholders has little, if any, basis to support it. On the other hand, these two classes do possess many points of similarity which would indicate that they are each stockholders of the association, although they may not have equal rights in the corporate property, and their duties and liabilities may differ in some respects. They each are members of the corporate body. They have equal voting privileges. The members of each class may act as directors and officers of the association. They are entitled to equal dividends on their stock. These rights and privileges are usually enjoyed only by stockholders of a corporation, and when they arise by reason of a person's relation to a corporation, invariably constitute that person a member of a corporation. Then again the name of the security--"membership shares"--is a clear indication that it was intended that the owners thereof were to be stockholders in the corporation. The word "shares", when used in connection with an interest in a corporation, invariably denotes the interest a stockholder has in the corporate property. Not content with designating the corporate interest of this class of investors in a building association as a "share", the act went further and described it as a "membership share", further indicating that the owner thereof was to be a member of the corporation or a stockholder thereof. *151
 It is true that the guarantee stockholders were entitled to participate in the reserve fund, which right was not enjoyed by the holders of membership shares, but this right given to the former does not affect the status of the latter as members of the corporation. Mere inequality in the right of different classes of stockholders to share in the profits of the corporation does not take either class out of the stockholders' status. Section 290 of the Civil Code provides for different classes of stockholders with different rights and liabilities, yet all are stockholders of the corporation. The laws of this state permit the formation of a corporation with preferred and common stock. The rights of these two classes of stockholders to share in the profits of the corporation are different, yet the members of each class are stockholders.
 There may be other slight differences between the rights and liabilities of guarantee stockholders and those of holders of membership shares, but they are not so fundamental that they change the character of the latter and constitute them creditors instead of stockholders, when they possess all the characteristics of stockholders above enumerated.
 Particular reliance is placed in the majority opinion upon the right of withdrawal which may be exercised by holders of membership shares, which right is not enjoyed by guarantee stockholders. Conceding that after this right has been exercised by shareholders, those exercising such right thereafter become creditors of the corporation and can no longer be regarded as stockholders, it does not follow that prior to exercising this right of withdrawal and from the inception of their acquiring membership shares, they were merely creditors. After exercising their right of withdrawal pursuant to the by-laws of the association, their only right therein was to receive the amount due on their surrendered shares. The association then owed them a debt, and that was its only obligation to them, and that was their only right. Prior thereto, their rights were entirely different. Before notice of withdrawal they had no right to demand of the association the amount called for by their shares, but were remitted to dividends on their shares. As we have seen, prior to withdrawal, they had all the rights of a stockholder including not only the right to receive dividends on their stock, but the right to vote at all its meetings, act as a director and officer of the association, and as we have seen, through this right they had a part in, and it was even within *152 their power, acting in conjunction with other holders of membership shares, to actually manage the affairs of the corporation. It seems too clear for argument that by exercising their right of withdrawal their status had been completely changed. Their rights as shareholders had been wiped out, and the new rights as creditors had been created.
 Those holders of membership shares, who were such at the time this association was taken over by the Building and Loan Commissioner for the purpose of liquidation, and they include all such shareholders who are now contending that they are mere creditors of the association, occupy an entirely different position. Respecting the rights of such shareholders, who attempted to withdraw after the Building and Loan Commissioner took over the association for the purpose of liquidating, the accepted rule is, "The rights of withdrawal 'are provided for with respect to going concerns only.' (Reddick v. United States B. & L. Assoc., 106 Ky. 94 [49 S.W. 1075]; and Hohenshell v. Home B. & L. Association, 140 Mo. 566, [41 S.W. 948])." (Pacific Coast Sav. Soc. v. Sturdevant, 165 Cal. 687 [133 P. 485, 49 L.R.A. (N. S.) 1142].) In that case, this court further said, [page 694] "Assuming that a notice of withdrawal given and accepted while the society is actually solvent gives stockholders so withdrawing the status of creditors after the lapse of the time required for notice, we think the burden is upon a stockholder seeking to show that his status has been changed to that of a creditor, to allege and prove the essential fact that the corporation, admittedly insolvent at the time the distribution is sought, was not insolvent when the alleged right of payment accrued."
 The Sturdevant case was cited with approval in Fidelity Savings & Loan Association v. Burnet, 65 Fed.2d 477, 481 [62 App. D. C. 131], where the court referring to the Sturdevant case construed it as follows: "In Pacific Coast Sav. Soc. v. Sturdevant, 165 Cal. 687, [133 P. 485, 49 L.R.A. (N. S.) 1142], a building association had become insolvent. Certain of its stockholders who had the right of withdrawal had given notice of their intention to withdraw. The question was, Did they, by virtue of this notice, change their position from stockholders to creditors, or, as stated by the Supreme Court of California, did they by this fact cease to be stockholders and become creditors? The court answered this question in the negative. It is quite true in that *153 case no guaranty stock had been sold and issued and therefore the provisions of the law subordinating that stock to the other stock did not apply, but the principle decided was conclusive of the legal relation of such shareholders to the association, that is to say, that they did not occupy to the association the same aspect as a depositor to a savings bank. And this, it seems to us, is necessarily correct, for, if it were held that the fact of the issue by the association of permanent stock itself made all other classes of stock debts, and all other stockholders creditors, it might, by the issuance of a negligible amount of guaranty stock relieve practically all of its assets from liability to general creditors except upon an equality with shareholders participating in the conduct of the association's affairs. Hence it would seem to us that the fact of the issue by the company of guaranty stock has no such significance as is claimed."
 The case of Cook v. Emmet Perpetual & Mutual Bldg. Assn., 90 Md. 284 [44 Atl. 1022], holds that general creditors are entitled to preference over stockholders who gave notice of withdrawal before judicial determination of insolvency where the association was in fact insolvent when the notice was given.
 In the present case, it was judicially determined that the Pacific Coast Building-Loan Association was insolvent on January 11, 1932, the day the Building and Loan Commissioner took possession of it for the purpose of liquidation, and it follows from the above authorities that any withdrawal, or any notice of withdrawal, after that date, was ineffectual to transform the stockholder attempting thus to withdraw into a creditor of the corporation.
 The main authority relied upon by the majority opinion as holding that these shareholders are creditors of the association is the case of In re Western States Building-Loan Association, 50 Fed.2d 632, in which it was held in effect that the right of a holder of membership shares created the association the "debtor of its shareholder" and accordingly holders of membership shares were creditors, and were entitled to sign a petition in involuntary bankruptcy proceedings. This case is out of line with the decision in the case of Fidelity Savings & Loan Association v. Burnet, supra, and the other cases relied upon above. The court in the Fidelity Savings & Loan Association case, supra, refused to follow the earlier case of In re Western States Building-Loan *154 Association, supra. The last-named case is a decision of the United States District Court and was rendered by an individual judge while the decision in the Fidelity Savings & Loan Association was by the Circuit Court of Appeals and was the unanimous conclusion of four justices of that court. I submit that, with due deference to the ability of the eminent jurist who wrote the earlier decision, the latter one is entitled to greater weight, as it is later in date, was rendered by a higher court, and was approved by four eminent justices thereof, while the first opinion had only the approval of a single member of the court. But independent of the weight to be given these opinions of the federal courts, the question before us is the construction of a statute of this state. The court in the Fidelity Savings & Loan Association, supra, cited and relied upon two decisions of this state, the Sturdevant case, supra, and Groover v. Pacific Coast Sav. Society, 164 Cal. 67 [127 P. 495, Ann. Cas. 1914B, 1261], and is, therefore, in harmony with the law as declared by the decisions of this state, while the decision in the Western States Building-Loan Association makes no reference to either of these two cases, or any other decision of this, or any other appellate court of this state. For this reason alone, the decision in the Western States Building- Loan Association case, supra, should not be followed by the courts of this state.
 The only correct conclusion that can be reached in this case, in my opinion, is that holders of membership shares are members of the association, and therefore are stockholders; that holders of investment certificates are creditors of the corporation, and are, therefore, entitled to be paid in full, principal and interest, before anything is paid to the stockholders. The case of Greva v. Rainey, 2 Cal.2d 338 [41 PaCal.2d 328], cited in the majority opinion, has no application in this case, as the controversy involved there was between two classes of bank depositors, all of whom were concededly creditors of the corporation. In reaching this conclusion it is not necessary to rely upon section 5.01 of the Building and Loan Act, which expressly provides that, "The holders of investment certificates ... shall be entitled upon liquidation of an association to receive payment in full before any payment or distribution shall be made to shareholders. ..." The judgment should *155 be reversed with directions to the Building and Loan Commissioner to pay to the holders of investment certificates, interest upon the amount due them on their investment certificates from the date on which the commissioner took over said association for the purpose of liquidation, to the date of payment.