[Civ. No. 35626. Second Dist., Div. One. Nov. 4, 1970.]

R. E. ALLEN, as Receiver, etc., Petitioner and Respondent, v. JOSEPH Z. TODD et al., Claimants and Appellants.

**COUNSEL**

L. W. Wrixon and Huston T. Carlyle for Claimants and Appellants.

Robert S. Morris for Defendant and Respondent.

**OPINION**

**GUSTAFSON, J.**—Tannen, Winslow & Co., Inc. (hereinafter referred to for convenience as the bond dealer), was engaged principally in the business of purchasing municipal bonds with the purpose of reselling them to the public. As such (Corp. Code, § 25006, since superseded by Corp.

Code, § 25004), the bond dealer was, as required (Corp. Code, § 25700, since superseded by Corp. Code, § 25210), licensed by the Commissioner of Corporations. The Commissioner of Corporations, believing that the bond dealer was violating the law, brought an action against the bond dealer seeking injunctive relief. (Corp. Code, § 26101, since superseded by Corp. Code, § 25530.) Ancillary to that action, respondent R. E. Allen was appointed receiver for the bond dealer November 7, 1967. (Code Civ. Proc., § 564.) It was later found that as of November 7, 1967, the liabilities of the bond dealer exceeded its assets by $260,115.51.

■ The trial court made an order approving a report and account filed by the receiver in which appellants were treated as general creditors. This order is appealable under what is now section 904.1 of the Code of Civil Procedure. (*Steinberg* v. *Goldstein* (1954) 122 Cal.App.2d 516 [265 P.2d 153].)

Appellants Henry Rainey and Helen Rainey (hereinafter referred to in the singular as Rainey) in September 1967 ordered from the bond dealer bonds of a designated issue of Calipatria Unified School District in the face amount of $10,000. The bond dealer owned bonds of that issue in that amount but did not own any other bonds of that issue of Calipatria Unified School District. The bonds, however, were not in the possession of the bond dealer since they were pledged to secure a loan made by Union Bank. Rainey paid the purchase price of $10,346.28 by check of October 4, 1967, which was deposited by the bond dealer on October 6, 1967. The written confirmation of Rainey's order stated that the bond dealer would deliver the bonds by registered mail after receipt of payment. It also stated that the bond dealer "may have hypothecated the securities herein described" but that any such hypothecation "will have ceased upon payment by you for the above described securities in the amount indicated and delivery of such securities to you or your order." Rainey received a receipt dated October 6, 1967, from the bond dealer which assured him that the securities would be sent as per instructions, i.e., by registered mail.

On the very day (October 6, 1967) that Rainey's check was cashed and the receipt was issued, the bond dealer on a demand note borrowed $30,000 from Crocker-Citizens National Bank for which it pledged the Calipatria Unified School District bonds together with other bonds as security. From the proceeds of the loan the bond dealer's debt to Union Bank was discharged and Union Bank delivered the Calipatria Unified School District bonds to Crocker-Citizens National Bank.

Appellant Joseph Z. Todd (hereinafter referred to as Todd) on October 27, 1967, ordered bonds from the bond dealer of a face amount of $5,000 of a particular issue of City of Modesto bonds. The bond dealer

owned bonds of the face value of that issue and no others of that issue. Todd paid $4,729.37 as the purchase price, but he did not receive delivery of the bonds because they were among those pledged to secure the loan to the bond dealer from Crocker-Citizens National Bank.

By late March 1968 the principal due to Crocker-Citizens National Bank had been reduced to $20,651.31. The bank then arranged for the pledged bonds to be sold in satisfaction of the debt. The pledged bonds (including the Calipatria Unified School District bonds and the City of Modesto bonds) were sold for $32,179.12 and after satisfaction of the debt there remained a surplus of $11,029.29. The net proceeds from the sale of the Calipatria Unified School District bonds were $9,905.17 and the net proceeds from the sale of the City of Modesto bonds were $4,652.61.

Todd filed a claim with the receiver April 4, 1968, demanding delivery of the City of Modesto bonds or the return of his purchase price and Rainey filed a similar claim with respect to the Calipatria Unified School District bonds on June 26, 1968. The receiver, of course, could not deliver the bonds because they had been sold by the bank. The question then became whether Rainey and Todd were entitled to all or a portion of the surplus from the sale of the pledged bonds to the exclusion of other creditors. The trial court found that they were not.

All parties agree that for the purpose of resolving the question here involved the receiver stands in the shoes of the bond dealer. The bond dealer was found by the trial court not to have been the fiduciary of either Rainey or Todd and not to have been the agent of either Rainey or Todd. It "acted as a principal and seller." Although the trial court did not expressly find that the particular bonds here in question had been sold to Rainey and Todd, the evidence permits no other conclusion.

The bond dealer was no less an owner of the bonds because they were not in its physical possession and were pledged to a bank to secure a loan. As between the bond dealer and each purchaser, the purchaser upon payment became the owner and was entitled to delivery. Only the wrongful act of the bond dealer in failing to take whatever steps were necessary to remove the sold bonds from the property pledged as security to the bank prevented delivery to the owners. Had the sold bonds been released by the bank and delivered to the bond dealer, Rainey and Todd would have been entitled to delivery of the bonds they had purchased.

How this release could have been accomplished is revealed by the record with respect to other bonds pledged at that bank. The bank held City of Vacaville bonds in the face amount of $5,000 and Pinedale County Water District bonds in the face amount of $5,000. On October 20, 1967, Alvin K. Link had undertaken to purchase the City of Vacaville bonds for a pur-

chase price of $4,404.67, and Murray Fisch had undertaken to purchase the Pinedale County Water District bonds for a purchase price of $5,106.67. Neither purchaser, however, had paid the purchase price by the time the receiver was appointed. The receiver arranged with the bank to release those bonds from the pledge and deliver them to the purchasers upon application of the net proceeds of the sale to the reduction of the debt at the bank. The receiver obviously did not believe that he had the right to collect the full purchase price from Link and Fisch, leave the bonds subject to the pledge and relegate the purchasers to the status of general creditors. But the receiver does believe that neither Rainey nor Todd, even though each paid in full, is entitled to any part of the proceeds of the sale of his bonds.

Rainey and Todd rely upon bankruptcy statutes (11 U.S.C. § 96(e)) and cases (e.g., *Blankenhorn-Hunter-Dulin Co.* v. *Thayer* (1926) 199 Cal. 90 [247 P. 1088, 48 A.L.R. 797]) which distinguish for purposes of preferences among (1) cash customers, (2) other customers and (3) general creditors of a stockbroker. These statutes and cases are inapposite. The bond dealer is not in bankruptcy and the receiver is not a trustee in bankruptcy. Moreover, a stockbroker is one who buys or sells stock as the agent of another, whereas the bond dealer here acted as a principal. Finally, the bonds purchased by Rainey and Todd are now owned by third persons not parties to this action.

█ On the other hand, there is no reason why principles of equitable relief cannot be invoked against a receiver. One such principle is an equitable lien. (Rest., Restitution, § 161.) Here there is no problem of tracing. █ The bond dealer wrongfully caused the bonds of Rainey and Todd to be used in discharging its debt to the bank as a result of which the bank holds a surplus payable to the receiver on behalf of the bond dealer.

The surplus, however, does not arise solely by virtue of the sale of the bonds belonging to Rainey and Todd. Other pledged bonds were also sold. The amount received from the sale of all of the pledged bonds was $32,179.12. Thus of the surplus of $11,029.29 remaining after discharge of the bond dealer's debt to the bank, $3,394.92 is attributable to the sale of Rainey's bonds and $1,594.66 is attributable to the sale of Todd's bonds. If the surplus funds held by the bank at the time of the order from which the appeals are taken have been drawing interest, Rainey and Todd would be entitled to interest on their respective shares of the fund. Since we do not know what the situation is with respect to interest, we do not modify the order, but rather reverse it so that the trial court may adjust the figures to reflect any interest to which Rainey and Todd are entitled on the surplus funds. The balance of the amount due to Rainey and Todd should be allowed and approved without preference or priority and without interest.

(*In re Pacific Coast Bldg.-Loan Assn.* (1940) 15 Cal.2d 134 [99 P.2d 251].)

We note that the solution we reach is similar to that which would be reached if the bond dealer were a bankrupt stockbroker. The property of customers of a stockbroker "and the proceeds of all customers' property rightfully transferred or unlawfully converted by the stockbroker" constitute a "single and separate fund" in which the customers are entitled to share ratably on the basis of their respective net equities. (11 U.S.C. § 96(e)(2).) "Any property remaining after the liquidation of a pledge made by a stockbroker shall be apportioned between his general estate and such single and separate fund in the proportion in which the general property of the stockbroker and the property of his customers contributed to such pledge." (11 U.S.C. § 96(e)(3).)

The receiver points out that among the pledged bonds were East San Bernardino Water District bonds of a face value of $2,000 for which M. M. Goldstein paid $1,752.58 on October 18, 1967, and that his claim for a preference was denied. That an erroneous ruling was made with respect to Goldstein's claim is no reason to affirm an erroneous ruling with respect to the claims of Rainey and Todd. That Goldstein did not appeal is probably attributable to the fact that his share of the surplus fund would be so small ($514.34) as to make further litigation worthless.

The receiver also points out that the bond dealer owned South Tahoe bonds in the face amount of $5,000. Three persons from October 27 to October 30, 1967, paid the bond dealer for bonds of that amount and description. None received delivery because the bonds were pledged to Crocker-Citizens National Bank. Again, each claim was allowed without preference or priority. The interesting question of whether the first buyer was entitled to the $1,638.20 of the surplus attributable to the sale of those bonds or whether all three were entitled to share in that amount need not be answered. No appeal was taken from the erroneous order that no one was entitled to preference in that amount.

The bank could have recouped everything owed by the bond dealer by selling less than all of the pledged bonds. For example, it could have been made whole and would have had a slight surplus ($1,124.12) if it had not sold Rainey's bonds along with the others. We expressly refrain from indicating what rights we think Rainey and Todd would have had in that or any other situation not before us.  ■  It is enough that we say that under the facts as disclosed by the record the bond dealer would be unjustly enriched if it were permitted to retain and pay to its general creditors that share of the surplus funds attributable to the sale of Rainey's and Todd's bonds for

which bonds Rainey and Todd paid in full and which, by the bond dealer's wrongdoing, they never received.

The order is reversed.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied November 30, 1970.