49 Cal.2d 370 (1957)
In re SECURITY FINANCE COMPANY (a Corporation), in Process of Voluntary Winding Up. EARL R. ROUDA, Respondent,
v.
GEORGE N. CROCKER et al., Appellants.
S. F. No. 19455. 
Supreme Court of California. In Bank. 
Nov. 12, 1957.
 Brobeck, Phleger & Harrison, Long & Levit, Malcolm T. Dungan and Bert W. Levit for Appellants.
 Young, Rabinowitz & Chouteau, Morris M. Doyle, William W. Schwarzer, and McCutcheon, Thomas, Matthew, Griffiths & Greene for Respondent.
 TRAYNOR, J.
 This appeal is from orders of the superior court granting a petition for judicial supervision and assuming jurisdiction under Corporations Code, section 4607, over a corporation allegedly in the process of voluntary winding up and dissolution pursuant to Corporations Code, section 4600.
 The Security Finance Company, the enterprise now alleged to be in the process of winding up, began in 1940 as a partnership engaged in the business of making personal loans and buying conditional sales contracts. The partners were Earl R. Rouda, and Herbert A. and George N. Crocker, who are brothers. Rouda had considerable experience in the personal loan business, and agreed to devote his talents and energies to the enterprise. The Crockers agreed to contribute $20,000 in capital and to secure necessary bank credit.
 In 1946 the partners decided to incorporate. They agreed that Rouda was to hold 3,000 shares and the Crockers 1,500 shares each of the common stock of the corporation. The Crockers and other shareholders, whose names do not appear in the record, hold 11,500 shares of preferred stock. The right to vote is vested exclusively with the common stock in the absence of default in the payment of dividends to the preferred shares.
 The incorporation agreement reaffirmed the principles on which the partnership was founded: Rouda agreed to "devote his entire and undivided time, attention, effort, business experience, and knowledge to the interests and conduct of the business ...," and to contribute his "work and labors specifically to the active management and operation of the business. ..." The Crockers agreed to procure loans from banks, and in their sole discretion to make available to the corporation their credit and financial standing. The agreement required *374 unanimity for all acts of the board of directors and for the exercise of powers vested in the voting shareholders, and provided generally that, "it is the intention of the parties hereto that the control of the corporation and of all its acts shall be exercised by and with the unanimous concurrence of all of the parties hereto." The agreement also provided that no shareholder could sell all his common stock unless the purchaser first agreed that it would become nonvoting stock, or agreed to the unanimous consent provisions in the incorporation agreement and the other shareholders were willing to have the transferee substituted for his transferor as a voting shareholder.
 Rouda is the president and general manager of the corporation and chairman of the board of directors. He has exclusive control of the day to day business of the corporation. Under Rouda's management the corporation has grown and prospered, and during the months immediately preceding the present litigation profits reached the highest level in the corporation's history.
 The parties had their first serious disagreement toward the end of 1952. The Crockers filed an action for dissolution of the corporation contending that Rouda had failed to devote his full time and energies to the business and had diverted to his own use the funds and property of the corporation and the services of its employees. Rouda then filed an action for declaratory relief contending that the Crockers had breached the incorporation agreement by failing to lend their credit to the corporation and by commencing the dissolution proceedings. These differences were compromised in March, 1954. In the settlement agreement Rouda agreed to pay $15,500 to the Crockers and $45,000 to the corporation, secured by a pledge of his stock. The parties thereupon released each other from all claims arising out of the subjects in dispute.
 Notwithstanding the settlement of the parties' disputes and the return of business to a high level of prosperity, Rouda, in December, 1954, expressed his wish to withdraw from the corporation. Without the consent of the Crockers, he negotiated for a sale of the business and received six offers from interested parties. The Crockers stated that they were completely satisfied with the prosperous condition of the business and did not wish to sell. They would consent to a sale of the business only if Rouda paid them $100,000 to release him from what they said was his contractual obligation to serve the corporation indefinitely. According to Rouda's testimony, *375 he then suggested that the Crockers buy his stock for $275,000 or an amount reached through negotiation, or if they did not buy within a certain time, that he would buy their stock for the same price. The Crockers were unwilling to buy Rouda's stock or to sell him theirs. This dispute culminated in an ultimatum from Rouda that if the Crockers did not agree to his proposal for a sale of stock or of the business, he would dissolve the corporation.
 As security for his promise to make payments under the settlement agreement of 1954, Rouda pledged all his stock to the Anglo-California Bank. In June, 1955, he redeemed the stock with money borrowed from the First Western Bank, and then immediately pledged the stock to First Western. He promised First Western that he would repay them with proceeds from the sale of the business, or, if the business was not sold, that he would dissolve the corporation and pay them from his distributive share. In the settlement agreement of 1954, Rouda promised to disclose his personal investments and business activities to the Crockers, but the Crockers did not learn of the second pledge until after this action was commenced.
 In July, 1955, Rouda, as holder of 50 per cent of the voting stock of Security Finance, executed and filed with the corporation his consent to voluntary dissolution. He then executed for the corporation and filed with the Secretary of State a certificate of election to wind up and dissolve. In August, 1955, he petitioned the superior court for judicial supervision of the winding up and dissolution. The petition states that the corporation is in the process of voluntary winding up and dissolution, and that judicial supervision is necessary because of serious differences of opinion between Rouda and the Crockers "with respect to conduct of the business of Security Finance Company, as well as with respect to a proper policy relating to salaries, dividends, financing, and sales of assets, as a result of which unanimous consent cannot be had." After a hearing on an order to show cause why the petition should not be granted, the court granted Rouda's petition and issued an order in which it assumed jurisdiction over the winding up of the corporation, directed that notice be given to shareholders and creditors, and appointed a referee to hear and determine any matters that might arise during the winding up. The Crockers appeal.
 [1] At common law a corporation had no power to end its existence. The shareholders could surrender the charter, but *376 actual dissolution depended on acceptance by the sovereign. Whether or not surrender of the charter of a prosperous corporation could be effected by a majority of the shareholders was long a subject of dispute. (See Bowditch v. Jackson Co., 76 N.H. 351 [82 A. 1014, 1016-1018, Ann.Cas. 1913A 366, L.R.A. 1917A 1174], appeal dismissed, 239 U.S. 627 [36 S.Ct. 164, 60 L.Ed. 474]; Warren, Voluntary Transfers of Corporate Undertakings, 30 Harv.L.Rev. 335-346; but see People v. Ballard, 134 N.Y. 269 [32 N.E. 54, 59, 17 L.R.A. 737]; Forrester v. Mining Co., 21 Mont. 544 [55 P. 229, 233, 353].) The fact that powers necessary for the attainment of corporate objectives were ordinarily vested in the majority did not necessarily mean that the minority should have no say on the fundamental issue of corporate life or death. In California, as in many other states, general statutory provisions authorize voluntary dissolution with the consent of a certain percentage of the shareholders.
 Section 4600 of the Corporations Code provides that, "Any corporation may elect to wind up its affairs and voluntarily dissolve by the vote or written consent of shareholders or members representing 50 percent or more of the voting power." Section 4607 provides that, "If a corporation is in the process of voluntary winding up, the superior court ... upon the petition of ... (b) the holders of 5 percent or more of the number of its outstanding shares ... may make orders and adjudge as to any and all matters concerning the winding up of the affairs of the corporation." Sections 4608 to 4619 provide that the jurisdiction of the court includes the determination of claims against the corporation and the rights of the shareholders in the assets, the settlement of directors' accounts, the appointment of referees, and other matters necessary for the equitable settlement of corporate affairs.
 [2] The court has jurisdiction by virtue of section 4607 only if the corporation is "in the process of voluntary winding up," and the corporation is in the process of voluntary winding up only if a valid election to wind up has been made pursuant to section 4600. In the present case, therefore, in assuming jurisdiction over the corporation the court necessarily determined that Rouda had validly consented and exercised the corporate election, and that the corporation was in the process of voluntary winding up and dissolution.
 [3] Shareholders representing 50 per cent of the voting power do not have an absolute right under section 4600 to dissolve a corporation. Thus, they have no right to dissolve *377 a corporation to defraud the other shareholders (see Kavanaugh v. Kavanaugh Knitting Co., 226 N.Y. 185 [123 N.E. 148]), to "freeze out" minority shareholders (see Lebold v. Inland Steel Co. [7th Cir.], 125 F.2d 369, 372, modified on rehearing, 136 F.2d 876, cert. denied, 316 U.S. 675 [62 S.Ct. 1045, 86 L.Ed. 1045]), or to sell the assets of the dissolved corporation at an inadequate price. (See J. H. Lane & Co. v. Maple Cotton Mills [4th Cir.], 226 F. 692, 695-698 [141 C.C.A 448], modified on rehearing, 232 F. 421 [146 C.C.A. 415].) [4] Under section 4600 the election to dissolve is the election of the corporation, not merely of shareholders representing 50 per cent of the voting power, although it is through their consent that the election is made. [5] There is nothing sacred in the life of a corporation that transcends the interests of its shareholders, but because dissolution falls with such finality on those interests, above all corporate powers it is subject to equitable limitations. (See Hornstein, Voluntary Dissolution--A New Development in Intracorporate Abuse, 51 Yale L. J. 64, 65-69.) [6] "The preamble or opening sentence of section 400, Civil Code [predecessor to section 4600], to the effect that 'if it is deemed advisable and for the benefit of any corporation that it be wound up and dissolved it may elect to terminate its business,' was eliminated by amendment in 1933. This was not intended, however, to raise any implication that the usual equitable obligations as to the exercise of good faith by the directors and shareholders in the exercise of the statutory power to dissolve were abrogated." (Ballantine and Sterling, California Corporation Laws 446 (1949 ed.).) The controlling issue, therefore, is whether Rouda's decision to dissolve the corporation was made in good faith.
 The Crockers contend that the order must be reversed on the ground that the trial court never passed on this issue. They contend that in the trial court Rouda proceeded on the theory that he had an absolute right to dissolution, that the trial court agreed with this theory, and that Rouda may not now change his theory of the case by asserting that the record contains evidence of good faith, which, they insist, they had no opportunity to controvert. There is no merit in these contentions. [7] The issue of Rouda's good or bad faith in seeking dissolution was placed directly in issue by the Crockers' answers to Rouda's petition, and the trial court repeatedly indicated that it would receive evidence of bad faith if it were offered. Accordingly, it is clear that the trial court did not accept Rouda's contention that bad faith was *378 immaterial, and by making that contention Rouda did not adopt it as an exclusive theory of his case. Thus, he introduced evidence of good faith and stated on at least two occasions that objections to questions asked by counsel for one of the Crockers would be withdrawn if the evidence was being offered on the issue of fraud. Facts bearing on Rouda's motivation were carefully elicited on both direct and cross-examination. [8] Although the record is not clear, it may be true that as to some of this evidence the trial court indicated that it was admitted on the issue of friction between the parties and not on the issue of good faith. If the trial court erred in this respect, however, the error was invited by the Crockers who objected on the ground that the evidence had no relevancy whatever to any possible issue in the case.
 [9] With respect to the issue of good faith there is evidence of the following facts. For several years before this action, Rouda had been attempting to receive a fair return on his investment. He sought an increase in salary or in dividends. Since the Crockers would not agree to either, he sought to sell his stock to them, to buy their stock, or to sell the assets of the corporation. The Crockers refused to allow Rouda an increase in salary as his responsibilities grew unless they received corresponding increases although they were required only to attend approximately four directors' meetings a year. For attending these meetings, they each received $500 per month. Rouda, however, was required to devote all his time to the business and received only $1,456 per month. The Crockers were both in high tax brackets and did not wish to increase dividends. They would not buy Rouda's stock, sell theirs to him, or consent to a sale of the business unless Rouda promised to pay them $100,000 as compensation for releasing him from his obligation to work for the corporation. Because of the restrictions placed on a transfer of the stock, Rouda was not able to sell his stock to outsiders at a price that fairly represented his investment in the corporation. Thus his purpose in dissolving the corporation was to protect his investment. [10] He did not act in bad faith in doing so, for a shareholder representing the requisite voting power may protect his investment by dissolution (cf., In re Evening Journal Ass'n., 15 N.J. Super 58 [83 A.2d 38, 41]) when, as in this case, all alternative methods are foreclosed, no advantage is secured over other shareholders, and no rights of third parties will be adversely affected. (See Lattin, Equitable Limitations on Statutory or Charter Powers Given to Majority Stockholders, 30 Mich.L.Rev. 645, 665.) *379
 [11] The Crockers contend that since Rouda consented to the adoption of the unanimous consent provisions and the restrictions on transfer of his stock, he is in no position to claim that he cannot realize his investment by way of dividends, salary, sale of assets, or sale of his shares and must therefore dissolve the corporation to realize that investment. His consent to the unanimous consent provisions, however, did not encompass consent to the abuse of these provisions by the Crockers to benefit themselves at Rouda's expense. Good faith on their part as directors was as essential as good faith on Rouda's part in seeking dissolution.
 [12] The Crockers also object to the ruling of the trial court excluding evidence that Rouda knew that the corporation would suffer if it were dissolved. The court rejected the offer of proof on the ground that if Rouda had a legal right to dissolve, injury to the corporation was immaterial. Rouda established that dissolution was necessary to protect his investment and that it will give him no unfair advantage, for it will affect Rouda and the Crockers equally. Since, as noted above, there is nothing sacred in the life of a corporation that transcends the interests of the shareholders, the court properly concluded that if Rouda had a right to dissolve the corporation, injury to it was immaterial. Although it is true that Rouda's knowledge that dissolution would injure the corporation was relevant to the issue of his good faith and in turn to the issue of his right to dissolve, no prejudice appears from the trial court's exclusion of this evidence on the issue of good faith. Thus, there was other evidence in the record that Rouda knew that dissolution would be detrimental to the corporation and it is clear that all of the parties and the court so understood.
 [13] The Crockers contend that in paragraph 13 [fn. *] of the settlement agreement Rouda waived any right to dissolve that *380 he might have had under section 4600. They urge that since the parties failed to reach unanimous consent only as to dividends and salaries, but not with respect to the operation of the business, the first sentence of paragraph 13 precludes dissolution. The next sentence, however, expressly declares that notwithstanding any provisions in the settlement agreement any party may take steps to dissolve the corporation pursuant to California law. Rouda's steps to dissolve were taken pursuant to California law.
 The Crockers also contend that even if Rouda has a right to dissolve the corporation, no showing was made that would give the court jurisdiction under section 4607 to supervise the dissolution. They state that no conflict was shown that prevents the operation of the business and that Rouda is no longer seeking an increase in salary or dividends. They state that Rouda has not shown that conflict will arise during the dissolution of the corporation. They claim that court supervision will put them to needless expense and will result in unnecessary crowding of the court calendar.
 [14] Under section 403 of the Civil Code, the predecessor section to section 4607, it was held that if the shareholder has properly instituted dissolution, he is entitled to court supervision as a matter of right. (In re San Joaquin L. & P. Corp., 52 Cal.App.2d 814, 824-825 [127 P.2d 29].) Although section 403 provided that the court shall take jurisdiction, whereas section 4607 provides that the court may take jurisdiction, the court in In re Mayellen Apartments, Inc., 134 Cal.App.2d 298, 303-308 [285 P.2d 943] declared that section 4607 was drafted to reenact section 403 and that the shareholder was entitled to judicial supervision as a matter of right. (See also Stubbs v. Jones, 121 Cal.App.2d 218 [263 P.2d 100].) It is unnecessary to decide whether court supervision can be invoked when there is no possibility of disputes arising among the shareholders during the dissolution, for the trial court in the present case could reasonably conclude that it was in the best interest of all the parties to have the court supervise the winding up of the corporation. The court, after a four- day hearing, decided that it should assume jurisdiction, and the evidence supports this conclusion. Even though Rouda seeks no increase in salary or dividends during dissolution, there was evidence that the Crockers threatened to delay dissolution for 10 to 15 years and that they would not consent to a sale of the assets of the corporation unless Rouda paid them $100,000. Furthermore, the past history of disputes between the parties, *381 indicates that it was unlikely that they would agree on a course of action during dissolution that would be in their common interest.
 [15] Finally, the Crockers contend that the corporation is not "in the process of voluntary winding up" because there was no special notice of a meeting of shareholders (see Corp. Code, 2201, subd. (e)) and all the shareholders did not approve the dissolution in lieu of a special meeting. (See Corp. Code, 2239.) Section 4600 provides for a vote or written consent. Sections 2201, subdivision (e), and 2239 would apply only if the election to dissolve had been by vote rather than by written consent.
 The orders are affirmed.
 Gibson, C.J., Shenk, J., Carter, J., Schauer, J., Spence, J., and McComb, J., concurred.
NOTES
[fn. *] *. "13. Future dissolution. If at any time hereafter the parties become unable to reach unanimous consent with respect to the operations of the Security corporations, this shall entitle Rouda or either of the Crockers, if so advised, to require a dissolution or winding up of the affairs of said corporation. It is agreed that notwithstanding any provision contained in the incorporation agreement, or in the articles or by-laws of the Security corporations, or in this agreement, nothing herein is intended to prevent any one or more of the parties hereto from taking such steps as he or they may be advised, in their own discretion to accomplish a dissolution or winding up of the affairs of the Security corporations pursuant to the provisions of California law, at any time hereafter. Proceedings looking toward dissolution or winding up of said corporations shall not be deemed to be a breach or violation of any agreement between the parties whatsoever. ..."