[L.A. No. 29651. In Bank. Nov. 7, 1969.]

JUNE K. JONES, Plaintiff and Appellant, v.
H. F. AHMANSON & COMPANY et al., Defendants and Appellants.

98

## COUNSEL

Darling, Mack, Hall & Call and W. John Kennedy for Plaintiff and Respondent.

Edward M. Raskin, Gerald E. Lichtig, Mitchell, Silberberg & Knupp and Howard S. Smith for Defendants and Respondents.

## OPINION

**TRAYNOR, C. J.**—June K. Jones, the owner of 25 shares of the capital stock of United Savings and Loan Association of California brings this action on behalf of herself individually and of all similarly situated minority stockholders of the Association. The defendants are United Financial Corporation of California, fifteen individuals, and four corporations, all of whom are present or former stockholders or officers of the Association. Plaintiff seek damages and other relief for losses allegedly suffered by the minority stockholders of the Association because of claimed breaches of fiduciary responsibility by defendants in the creation and operation of United Financial, a Delaware holding company that owns 87 percent of the outstanding Association stock.

Plaintiff appeals from the judgment entered for defendants after an order sustaining defendants' general and special demurrers to her third amended complaint without leave to amend. Defendants have filed a protective cross-appeal. We have concluded that the allegations of the complaint and certain stipulated facts sufficiently state a cause of action and that the judgment must therefore be reversed.

The following facts appear from the allegations of the complaint and stipulation.

United Savings and Loan Association of California is a California chartered savings and loan association that first issued stock on April 5, 1956.[1] Theretofore it had been owned by its depositors, who, with borrowing members, elected the board of directors. No one depositor had sufficient voting power to control the Association.

---

[1] A California savings and loan association may be incorporated with shares, or stock, or both. (Fin. Code, §§ 5500, 6400.) Thus investors in California associations are identified as shareholders, i.e., holders of withdrawable shares of the association (Fin. Code, §§ 5066, 5067) or stockholders, i.e., holders of guarantee stock of the association (Fin. Code, §§ 5068, 5069). The principal distinctions between stock and shares of a savings and loan association are described in *In re Pacific Coast Bldg.-Loan Assn. of Los Angeles,* 15 Cal.2d 134, 142 [99 P.2d 251].

The Association issued 6,568 shares of stock on April 5, 1956. No additional stock has been issued. Of these shares, 987 (14.8 percent) were purchased by depositors pursuant to warrants issued in proportion to the amount of their deposits. Plaintiff was among these purchasers. The shares allocated to unexercised warrants were sold to the then chairman of the board of directors who later resold them to defendants and others. The stockholders have the right to elect a majority of the directors of the Association.

The Association has retained the major part of its earnings in tax-free reserves with the result that the book value of the outstanding shares has increased substantially.[2] The shares were not actively traded. This inactivity is attributed to the high book value, the closely held nature of the Association,[3] and the failure of the management to provide investment information and assistance to shareholders, brokers, or the public. Transactions in the stock that did occur were primarily among existing stockholders. Fourteen of the nineteen defendants comprised 95 percent of the market for Association shares prior to 1959.

In 1958 investor interest in shares of savings and loan associations and holding companies increased. Savings and loan stocks that were publicly marketed enjoyed a steady increase in market price thereafter until June 1962, but the stock of United Savings and Loan Association was not among them. Defendants determined to create a mechanism by which they could participate in the profit taking by attracting investor interest in the Association. They did not, however, undertake to render the Association shares more readily marketable. Instead, the United Financial Corporation of California was incorporated in Delaware by all of the other defendants except defendant Thatcher on May 8, 1959. On May 14, 1959, pursuant to a prior agreement, certain Association stockholders who among them owned a majority of the Association stock exchanged their shares for those of United Financial, receiving a "derived block" of 250 United Financial shares for each Association share.[4]

After the exchange, United Financial held 85 percent of the outstanding Association stock. More than 85 percent of United Financial's consolidated earnings[5] and book value of its shares reflected its ownership of this

---

[2]Between 1959 and 1966 the book value of each share increased from $1,131 to $4,143.70.

[3]H. F. Ahmanson & Co. acquired a majority of the shares in May 1958. On May 14, 1959, the company owned 4,171 of the outstanding shares.

[4]The number of shares in these derived blocks of United Financial stock was later modified by pro-rata surrenders and stock dividends in a series of transactions not pertinent here.

[5]The balance reflected United Financial's ownership of three insurance agencies and stock in a fourth.

Association stock. The former majority stockholders of the Association had become the majority shareholders of United Financial and continued to control the Association through the holding company. They did not offer the minority stockholders of the Association an opportunity to exchange their shares.

The first public offering of United Financial stock was made in June 1960. To attract investor interest, 60,000 units were offered, each of which comprised two shares of United Financial stock and one $100, 5 percent interest-bearing, subordinated, convertible debenture bond. The offering provided that of the $7,200,000 return from the sale of these units, $6,200,000 would be distributed immediately as a return of capital to the original shareholders of United Financial, *i.e.*, the former majority stockholders of the Association.[6] To obtain a permit from the California Corporations Commissioner for the sale, United Financial represented that the financial reserve requirement for debenture repayment established by Commissioner's Rules 480 subdivision (a) and 486[7] would be met by causing the Association to liquidate or encumber its income producing assets for cash that the Association would then distribute to United Financial to service and retire the bonds.[8]

---

[6]This distribution was equivalent to a $927.50 return of capital on each derived block of shares.

[7]Rule 480 then provided: "Debentures, Notes and Evidences of Indebtedness, Unsecured. Ordinarily an application for a permit to sell and issue unsecured notes, evidences of indebtedness or debentures by a new or comparatively inactive company will be considered with disfavor:

(a) If the issue creates indebtedness in excess of two times the tangible net worth of the issuer;

(b) Unless the issue provides for continued participation in the issuer on an equitable basis upon the redemption or retirement of the notes, evidences of indebtedness or debentures;

(c) Unless estimated annual net earnings are at least two times annual interest and sinking fund or serial redemption requirements;

(d) Unless the sinking fund or serial redemption requirements contemplate the retirement of the entire issue by date of maturity."

Rule 486 then provided: "Required Earnings and Sinking Fund. Ordinary average annual earnings, before taxes, for the five-year period preceding the issue, and for the year immediately preceding the issue, or estimated earnings, should be at least two times annual interest requirments. Ordinarily average annual earnings, after taxes, and after giving effect to interest requirements on the proposed new security, for such five-year period and for such year, or estimated earnings, should be at least two times sinking fund or serial redemption requirements. The sinking fund or serial redemption requirements ordinarily should be based on a contemplated retirement of substantially the entire issue by maturity."

The Commissioner has since adopted new rules. (Rules 260.140.4-9.)

[8]Plaintiff alleges at Paragraph V(C)(3) of her complaint that United Financial represented to the Corporations Commissioner that: "The financial reserves for debentures repayment required by the Commissioner's Rules 480(a) and 486 would be satisfied by having United Financial exercise its control to cause the ASSOCIATION to liquidate or encumber its income producing assets for cash and then cause the

In the Securities and Exchange Commission prospectus accompanying this first public offering, United Financial acknowledged that its prior earnings were not sufficient to service the debentures and noted that United Financial's direct earnings would have to be augmented by dividends from the Association.

A public offering of 50,000 additional shares by United Financial with a secondary offering of 600,000 shares of the derived stock by the original investors was made in February 1961 for a total price of $15,275,000. The defendants sold 568,190 shares of derived stock in this secondary offering. An underwriting syndicate of 70 brokerage firms participated. The resulting nationwide publicity stimulated trading in the stock until, in mid-1961, an average of 708.5 derived blocks were traded each month. Sales of Association shares decreased during this period from a rate of 170 shares per year before the formation of United Financial to half that number. United Financial acquired 90 percent of the Association shares that were sold.

Shortly after the first public offering of United Financial shares, defendants caused United Financial to offer to purchase up to 350 shares of Association stock for $1,100 per share. The book value of each of these shares was $1,411.57, and earnings were $301.15 per share. The derived blocks of United Financial shares then commanded an aggregate price of $3,700 per block exclusive of the $927.50 return of capital. United Financial acquired an additional 130 shares of Association stock as a result of this offer.

In 1959 and 1960 extra dividends of $75 and $57 per share had been paid by the Association, but in December 1960, after the foregoing offer had been made, defendants caused the Association's president to notify each minority stockholder by letter that no dividends other than the regular $4 per share annual dividend would be paid in the near future. The Association president, defendant M. D. Jameson, was then a director of both the Association and United Financial.

Defendants then proposed an exchange of United Financial shares for Association stock. Under this proposal each minority stockholder would

ASSOCIATION to distribute the cash to United Financial in order to service and retire the debentures." Defendants dispute plaintiff's interpretation of United Financial's representations. They claim that United Financial did no more than promise to liquidate its own assets, *i.e.*, the Association stock that it owned, and distribute those assets to service the debt. On appeal from a judgment entered after a demurrer has been sustained, a reviewing court must accept all properly pleaded allegations not inconsistent with other allegations as true. (*Stigall* v. *City of Taft*, 58 Cal.2d 565, 567 [27 Cal.Rptr. 441, 375 P.2d 289]; *Katenkamp* v. *Union Realty Co.*, 6 Cal.2d 765, 769 [59 P.2d 473].) No dispute can exist as to the interpretation of the allegation of the complaint here in question.

have received approximately 51 United Financial shares of a total value of $2,400 for each Association share. When the application for a permit was filed with the California Corporations Commissioner on August 28, 1961, the value of the derived blocks of United Financial shares received by defendants in the initial exchange had risen to approximately $8,800.[9] The book value of the Association stock was in excess of $1,700 per share, and the shares were earning at an annual rate of $615 per share. Each block of 51 United Financial shares had a book value of only $210 and earnings of $134 per year, 85 percent of which reflected Association earnings. At the hearings held on the application by the Commissioner, representatives of United Financial justified the higher valuation of United Financial shares on the ground that they were highly marketable, whereas Association stock was unmarketable and poor collateral for loans. Plaintiff and other minority stockholders objected to the proposed exchange, contending that the plan was not fair, just, and equitable. Defendants then asked the Commissioner to abandon the application without ruling on it.

Plaintiff contends that in following this course of conduct defendants breached the fiduciary duty owed by majority or controlling shareholders to minority shareholders. She alleges that they used their control of the Association for their own advantage to the detriment of the minority when they created United Financial, made a public market for its shares that rendered Association stock unmarketable except to United Financial, and then refused either to purchase plaintiff's Association stock at a fair price or exchange the stock on the same basis afforded to the majority. She further alleges that they also created a conflict of interest that might have been avoided had they offered all Association stockholders the opportunity to participate in the initial exchange of shares. Finally, plaintiff contends that the defendants' acts constituted a restraint of trade in violation of common law and statutory antitrust laws.

## I

### Plaintiff's Capacity to Sue

We are faced at the outset with defendants' contention that if a cause of action is stated, it is derivative in nature since any injury suffered is common to all minority stockholders of the Association. Therefore, defendants urge, plaintiff may not sue in an individual capacity or on behalf of a class made up of stockholders excluded from the United Financial ex-

---

[9] The derived block sold for as much as $13,127.41 during 1960-1961. On January 30, 1962, the date upon which plaintiff commenced this action, the mean value was $9,116.08.

change, and in any case may not maintain a derivative action without complying with Financial Code section 7616.[10] Defendants invoke *Shaw* v. *Empire Sav. & Loan Assn.,* 186 Cal.App.2d 401 [9 Cal.Rptr. 204]. There the defendant majority stockholder, who controlled the board of directors, had the bylaws amended to delete a provision granting preemptive rights and thereafter caused the Association to issue shares to himself at less than market or book value, thus diluting plaintiff minority stockholder's interest. Plaintiff sought a declaration that he was entitled to maintain his proportionate interest in the Association either through purchase of a proportionate number of shares from the buyer or issuance of a proportionate number of additional shares to him by the Association on the same terms. The Court of Appeal concluded that inasmuch as the injury to the plaintiff was no different from that caused other minority stockholders, relief was available only in a derivative action.

Analysis of the nature and purpose of a shareholder's derivative suit will demonstrate that the test, adopted in the *Shaw* case does not properly distinguish the cases in which an individual cause of action lies. ▮ A shareholder's derivative suit seeks to recover for the benefit of the corporation and its whole body of shareholders when injury is caused to the corporation that may not otherwise be redressed because of failure of the corporation to act. ▮ Thus, "the action is derivative, i.e., in the corporate right, if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock and property without any severance or distribution among individual holders, or it seeks to recover assets for the corporation or to prevent the dissipation of its assets." (*Gagnon Co., Inc.* v. *Nevada Desert Inn, Inc.* 45 Cal.2d 448, 453 [289 P.2d 466];

---

[10]Section 7616 provides: "No action may be instituted or maintained in the right of any association by any shareholder or certificate holder, as such. Such action may not be instituted or maintained by a stockholder of any association, unless all of the following conditions exist:

"(1) The plaintiff alleges in the complaint that he was a registered stockholder at the time of the transaction or any part thereof of which he complains or that his stock thereafter devolved upon him by operation of law from a holder who was a holder at the time of the transaction or any part thereof complained of.

"(2) The plaintiff alleges in the complaint with particularity his efforts to secure from the board of directors such action as he desires and alleges further that he has either informed the association or such board of directors in writing of the ultimate facts of each cause of action against each defendant director or delivered to the association or such board of directors a true copy of the complaint which he proposes to file, and the reasons for his failure to obtain such action or the reasons for not making such effort.

"(3) The commissioner shall have determined, after a hearing upon at least 20 days' written notice to such association and each of its directors, that such action (a) is proposed in good faith and (b) there is reasonable possibility that the prosecution of such action will benefit the association and its stockholders.

"Subdivision (b) and (c) of Section 834 of the Corporations Code shall be applicable in the case of any such action."

*Sutter* v. *General Petroleum Corp.,* 28 Cal.2d 525, 530 [170 P.2d 898, 167 A.L.R. 271]; see Ballantine & Sterling, California Corporation Laws (4th ed. 1968) 168B.) ■ "A stockholder's derivative suit is brought to enforce a cause of action which the corporation itself possesses against some third party, a suit to recompense the corporation for injuries which it has suffered as a result of the acts of third parties. ■ The management owes to the stockholders a duty to take proper steps to enforce all claims which the corporation may have. When it fails to perform this duty, the stockholders have a right to do so. Thus, although the corporation is made a defendant in a derivative suit, the corporation nevertheless is the real plaintiff and it alone benefits from the decree; the stockholders derive no benefit therefrom except the indirect benefit resulting from a realization upon the corporation's assets. ■ The stockholder's individual suit, on the other hand, is a suit to enforce a right against the corporation which the stockholder possesses as an individual." (Rules of Civ. Proc. for U.S. District Courts, Advisory Committee Notes (1966) H.R. Doc. No. 391, 89th Cong., 2d Sess. 40.)

■ It is clear from the stipulated facts and plaintiff's allegations that she does not seek to recover on behalf of the corporation for injury done to the corporation by defendants. Although she does allege that the value of her stock has been diminished by defendants' actions, she does not contend that the diminished value reflects an injury to the corporation and resultant depreciation in the value of the stock. Thus the gravamen of her cause of action is injury to herself and the other minority stockholders.

In *Shaw* v. *Empire Sav. & Loan Assn., supra,* 186 Cal.App.2d 401, the court noted the "well-established general rule that a stockholder of a corporation has no personal or individual right of action against third persons, including the corporation's officers and directors, for a wrong or injury to the corporation which results in the destruction or depreciation of the value of his stock, since the wrong thus suffered by the stockholder is merely incidental to the wrong suffered by the corporation and affects all stockholders alike." (186 Cal.App.2d 401, 407.) From this the court reasoned that a minority shareholder could not maintain an individual action unless he could demonstrate the injury to him was somehow different from that suffered by other *minority* shareholders. (186 Cal.App.2d 401, 408.) In so concluding the court erred. ■ The individual wrong necessary to support a suit by a shareholder need not be unique to that plaintiff.[11] The same injury may affect a substantial number of shareholders. If the injury is not incidental to an injury to the corporation, an individual cause of action exists. To the extent that *Shaw* v. *Empire Sav. &*

---

[11]See Note, 49 Cal.L.Rev. 561, criticizing the result in *Shaw* and pointing out that the rule espoused by the Court of Appeal would leave the shareholder whose injury was not unique without a remedy if the corporation was not also injured by the same wrongful conduct.

*Loan Assn.* is inconsistent with the opinion expressed herein, it is disapproved.

## II

### *Majority Shareholders' Fiduciary Responsibility*

Defendants take the position that as shareholders they owe no fiduciary obligation to other shareholders, absent reliance on inside information, use of corporate assets, or fraud. This view has long been repudiated in California. The Courts of Appeal have often recognized that majority shareholders, either singly or acting in concert to accomplish a joint purpose, have a fiduciary responsibility to the minority and to the corporation to use their ability to control the corporation in a fair, just, and equitable manner. ■ Majority shareholders may not use their power to control corporate activities to benefit themselves alone or in a manner detrimental to the minority. Any use to which they put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business. (*Brown* v. *Halbert,* 271 Cal.App.2d 252 [76 Cal.Rptr. 781]; *Burt* v. *Irvine Co.,* 237 Cal.App.2d 828 [47 Cal.Rptr. 392]; *Efron* v. *Kalmanovitz,* 226 Cal.App.2d 546 [38 Cal.Rptr. 148]; *Remillard Brick Co.* v. *Remillard-Dandini Co.,* 109 Cal.App.2d 405 [241 P.2d 66].)

The extensive reach of the duty of controlling shareholders and directors to the corporation and its other shareholders was described by the Court of Appeal in *Remillard Brick Co.* v. *Remillard-Dandini Co., supra,* 109 Cal.App.2d 405, where, quoting from the opinion of the United States Supreme Court in *Pepper* v. *Litton,* 308 U.S. 295 [84 L.Ed. 281, 60 S.Ct. 238], the court held: ■ " 'A director is a fiduciary . . . So is a dominant or controlling stockholder or group of stockholders . . . Their powers are powers of trust . . . ■ Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein . . . ■ The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.' ■ Referring directly to the duties of a director the court stated . . .: 'He who is in such a fiduciary position cannot serve himself first and his *cestuis* second. He cannot manipulate the affairs of his corporation to their detriment and in disregard of the standards of common decency and honesty. He cannot

by the intervention of a corporate entity violate the ancient precept against serving two masters. He cannot by the use of the corporate device avail himself of privileges normally permitted outsiders in a race of creditors. He cannot utilize his inside information and his strategic position for his own preferment. He cannot violate rules of fair play by doing indirectly through the corporation what he could not do directly. He cannot use his power for his personal advantage and to the detriment of the stockholders and creditors no matter how absolute in terms that power may be and no matter how meticulous he is to satisfy technical requirements. ▇ For that power is at all times subject to the equitable limitation that it may not be exercised for the aggrandizement, preference, or advantage of the fiduciary to the exclusion or detriment of the *cestuis*. Where there is a violation of these principles, equity will undo the wrong or intervene to prevent its consummation.' This is the law of California." (109 Cal.App.2d 405, 420-421.) In *Remillard* the Court of Appeal clearly indicated that the fiduciary obligations of directors and shareholders are neither limited to specific statutory duties and avoidance of fraudulent practices nor are they owed solely to the corporation to the exclusion of other shareholders.

Defendants assert, however, that in the use of their own shares they owed no fiduciary duty to the minority stockholders of the Association. They maintain that they made full disclosure of the circumstances surrounding the formation of United Financial, that the creation of United Financial and its share offers in no way affected the control of the Association, that plaintiff's proportionate interest in the Association was not affected, that the Association was not harmed, and that the market for Association stock was not affected. Therefore, they conclude, they have breached no fiduciary duty to plaintiff and the other minority stockholders.

▇ Defendants would have us retreat from a position demanding equitable treatment of all shareholders by those exercising control over a corporation to a philosophy much criticized by commentators and modified by courts in other jurisdictions as well as our own. In essence defendants suggest that we reaffirm the so-called "majority" rule reflected in our early decisions. This rule, exemplified by the decision in *Ryder* v. *Bamberger*, 172 Cal. 791 [158 P. 753], but since severely limited, recognized the "perfect right [of majority shareholders] to dispose of their stock . . . without the slightest regard to the wishes and desires or knowledge of the minority stockholders; . . ." (p. 806) and held that such fiduciary duty as did exist in officers and directors was to the corporation only. The duty of shareholders as such was not recognized unless they, like officers and directors, by virtue of their position were possessed of information relative to the value of the corporation's shares that was not available to outside shareholders. In such case the existence of special facts permitted a finding

that a fiduciary relationship to the corporation and other shareholders existed. (*Hobart* v. *Hobart Estate Co.,* 26 Cal.2d 412 [159 P.2d 958].)

We had occasion to review these theories as well as the "minority rule" that directors and officers have an obligation to shareholders individually not to profit from their official position at the shareholders' expense in *American Trust Co.* v. *California etc. Ins. Co.,* 15 Cal.2d 42 [98 P.2d 497]. Each of the traditional rules has been applied under proper circumstances to enforce the fiduciary obligations of corporate officers and directors to their *cestuis.* (*Lawrence* v. *I. N. Parlier Estate Co.,* 15 Cal.2d 220 [100 P.2d 765] [directors may not engage in any transaction that will conflict with their duty to the shareholders or make use of their power or of the corporate property for their own advantage]; *Hobart* v. *Hobart Estate Co., supra,* 26 Cal.2d 412 [officer must disclose knowledge of corporate business to shareholder in transaction involving transfer of stock]; *In re Security Finance Co.,* 49 Cal.2d 370 [317 P.2d 1] [majority shareholders' statutory powers subject to equitable limitation of good faith and inherent fairness to minority].) The rule that has developed in California is a comprehensive rule of "inherent fairness from the viewpoint of the corporation and those interested therein." (*Remillard Brick Co.* v. *Remillard-Dandini Co., supra,* 109 Cal.App.2d 405, 420. See also, *In re Security Finance Co., supra,* 49 Cal.2d 370; *Brown* v. *Halbert, supra,* 271 Cal.App.2d 252; *Burt* v. *Irvine Co., supra,* 237 Cal.App.2d 828; *Efron* v. *Kalmanovitz, supra,* 226 Cal.App.2d 546.) The rule applies alike to officers, directors, and controlling shareholders in the exercise of powers that are theirs by virtue of their position and to transactions wherein controlling shareholders seek to gain an advantage in the sale or transfer or use of their controlling block of shares. Thus we held in *In re Security Finance Co., supra,* 49 Cal.2d 370, that majority shareholders do not have an absolute right to dissolve a corporation, although ostensibly permitted to do so by Corporations Code section 4600, because their statutory power is subject to equitable limitations in favor of the minority. We recognized that the majority had the right to dissolve the corporation to protect their investment *if* no alternative means were available *and* no advantage was secured over other shareholders, and noted that "[t]here is nothing sacred in the life of a corporation that transcends the interests of its shareholders, but because dissolution falls with such finality on those interests, above all corporate powers it is subject to equitable limitations." (49 Cal.2d 370, 377.)

The extension of fiduciary obligations to controlling shareholders in their exercise of corporate powers and dealings with their shares is not a recent development. The Circuit Court for the Southern District of New York said in 1886 that "[w]hen a number of stockholders combine to constitute themselves a majority in order to control the corporation as they

see fit, they become for all practical purposes the corporation itself, and assume the trust relation occupied by the corporation towards its stockholders." (*Ervin* v. *Oregon Ry. & Nav. Co.* (S.D.N.Y. 1886) 27 F. 625, 631.) Professor Lattin has suggested that "the power to control, or rather its use, should be considered in no lesser light than that of a trustee to deal with the trust estate and with the beneficiary. Self-dealing in whatever form it occurs should be handled with rough hands for what it is—dishonest dealing. And while it is often difficult to discover self-dealing in mergers, consolidations, sale of all the assets or dissolution and liquidation, the difficulty makes it even more imperative that the search be thorough and relentless." (Lattin, Corporations (1959) 565.)

The increasingly complex transactions of the business and financial communities demonstrate the inadequacy of the traditional theories of fiduciary obligation as tests of majority shareholder responsibility to the minority. These theories have failed to afford adequate protection to minority shareholders and particularly to those in closely held corporations whose disadvantageous and often precarious position renders them particularly vulnerable to the vagaries of the majority. Although courts have recognized the potential for abuse or unfair advantage when a controlling shareholder sells his shares at a premium over investment value (*Perlman* v. *Feldmann,* 219 F.2d 173 [50 A.L.R.2d 1134] [premium paid for control over allocation of production in time of shortage]; *Gerdes* v. *Reynolds,* 28 N.Y.S.2d 622 [sale of control to looters or incompetents]; *Porter* v. *Healy,* 244 Pa. 427 [91 A. 428]; *Brown* v. *Halbert, supra,* 271 Cal.App.2d 252 [sale of only controlling shareholder's shares to purchaser offering to buy assets of corporation or all shares]) or in a controlling shareholder's use of control to avoid equitable distribution of corporate assets (*Zahn* v. *Transamerica Corp.* (3rd Cir. 1946) 162 F.2d 36 [172 A.L.R. 495] [use of control to cause subsidiary to redeem stock prior to liquidation and distribution of assets]), no comprehensive rule has emerged in other jurisdictions. Nor have most commentators approached the problem from a perspective other than that of the advantage gained in the sale of control. Some have suggested that the price paid for control shares over their investment value be treated as an asset belonging to the corporation itself (Berle and Means, The Modern Corporation and Private Property (1932) p. 243), or as an asset that should be shared proportionately with all shareholders through a general offer (Jennings, *Trading in Corporate Control* (1956) 44 Cal.L.Rev. 1, 39), and another contends that the sale of control at a premium is always evil (Bayne, *The Sale-of-Control Premium: the Intrinsic Illegitimacy* (1969) 47 Texas L.Rev. 215).

The additional potential for injury to minority shareholders from ma-

jority dealings in its control power apart from sale has not gone unrecognized, however. The ramifications of defendants' actions here are not unlike those described by Professor Gower as occurring when control of one corporation is acquired by another through purchase of less than all of the shares of the latter: "The [acquired] company's existence is not affected, nor need its constitution be altered; all that occurs is that its shareholders change. From the legal viewpoint this methodological distinction is formidable, but commercially the two things may be almost identical. If . . . a controlling interest is acquired, the [acquired] company . . . will become a subsidiary of the acquiring company . . . and cease, in fact though not in law, to be an independent entity.

"This may produce the situation in which a small number of dissentient members are left as a minority in a company intended to be operated as a member of a group. As such, their position is likely to be unhappy, for the parent company will wish to operate the subsidiary for the benefit of the group as a whole and not necessarily for the benefit of that particular subsidiary." (Gower, The Principles of Modern Company Law (2d ed. 1957) p. 561.) Professor Eisenberg notes that as the purchasing corporation's proportionate interest in the acquired corporation approaches 100 percent, the market for the latter's stock disappears, a problem that is aggravated if the acquiring corporation for its own business purposes reduces or elminates dividends. (Eisenberg, *The Legal Role of Shareholders and Management in Modern Corporate Decision-Making* (1969) 57 Cal.L.Rev. 1, 132. See also, O'Neal and Derwin, Expulsion or Oppression of Business Associates (1961) *passim;* Leech, *Transactions in Corporate Control* (1956) 104 U.Pa.L.Rev. 725, 728; Comment, *The Fiduciary Relation of the Dominant Shareholder to the Minority Shareholders* (1958) 9 Hastings L.J. 306, 314.) The case before us, in which no sale or transfer of actual control is directly involved, demonstrates that the injury anticipated by these authors can be inflicted with impunity under the traditional rules and supports our conclusion that the comprehensive rule of good faith and inherent fairness to the minority in any transaction where control of the corporation is material properly governs controlling shareholders in this state.[12]

We turn now to defendants' conduct to ascertain whether this test is met.

---

[12]Contrary to defendants' suggestion that *Christophides* v. *Porco* (S.D.N.Y. 1968) 289 F.Supp. 403 provides support for their argument that they owe no fiduciary duty to the minority and may act with impunity to cause a diminution in the value of minority shares, the district court noted that although such conduct did not violate the Securities and Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), the charge might have significance "in respect of some sort of a state-created claim for fiduciary breach" over which that court lacked jurisdiction. (289 F.Supp. at p. 407.)

## III

### *Formation of United Financial and Marketing its Shares*

█ Defendants created United Financial during a period of unusual investor interest in the stock of savings and loan associations. They then owned a majority of the outstanding stock of the Association. This stock was not readily marketable owing to a high book value, lack of investor information and facilities, and the closely held nature of the Association. The management of the Association had made no effort to create a market for the stock or to split the shares and reduce their market price to a more attractive level. Two courses were available to defendants in their effort to exploit the bull market in savings and loan stock. Both were made possible by defendants' status as controlling stockholders. The first was either to cause the Association to effect a stock split (Corp. Code, § 1507) and create a market for the Association stock or to create a holding company for Association shares and permit all stockholders to exchange their shares before offering holding company shares to the public. All stockholders would have benefited alike had this been done, but in realizing their gain on the sale of their stock the majority stockholders would of necessity have had to relinquish some of their control shares. Because a public market would' have been created, however, the minority stockholders would have been able to extricate themselves without sacrificing their investment had they elected not to remain with the new management.

The second course was that taken by defendants. A new corporation was formed whose major asset was to be the control block of Association stock owned by defendants, but from which minority shareholders were to be excluded. The unmarketable Association stock held by the majority was transferred to the newly formed corporation at an exchange rate equivalent to a 250 for 1 stock split. The new corporation thereupon set out to create a market for its own shares. Association stock constituted 85 percent of the holding company's assets and produced an equivalent proportion of its income. The same individuals controlled both corporations. It appears therefrom that the market created by defendants for United Financial shares was a market that would have been available for Association stock had defendants taken the first course of action.[13]

---

[13]The situation of minority stockholders and the difficulties they faced in attempting to market their savings and loan stock were described in The Savings and Loan Industry in California, a report prepared by the Stanford Research Institute for the California Savings and Loan Commissioner, and published by the Commissioner in 1960. The attractiveness of the holding company as a device to enhance liquidity was recognized: "The majority and minority stockholders in the original associations often found that they had difficulties in selling their shares at a price approximating their book value. Their main difficulties arose from the fact that book values and prices of shares often ran into many thousands of dollars, a price not generally suitable for

After United Financial shares became available to the public it became a virtual certainty that no equivalent market could or would be created for Association stock. United Financial had become the controlling stockholder and neither it nor the other defendants would benefit from public trading in Association stock in competition with United Financial shares. Investors afforded an opportunity to acquire United Financial shares would not be likely to choose the less marketable and expensive Association stock in preference. Thus defendants chose a course of action in which they used their control of the Association to obtain an advantage not made available to all stockholders. They did so without regard to the resulting detriment to the minority stockholders and in the absence of any compelling business purpose. Such conduct is not consistent with their duty of good faith and inherent fairness to the minority stockholders. Had defendants afforded the minority an opportunity to exchange their stock on the same basis or offered to purchase them at a price arrived at by independent appraisal, their burden of establishing good faith and inherent fairness would have been much less. At the trial they may present evidence tending to show such good faith or compelling business purpose that would render their action fair under the circumstances. On appeal from the judgment of

---

wide public sale. These shares were usually owned by a relatively small number of stockholders. When one of them, or his heirs, wished to sell his shares, he had to negotiate with a buyer in this small group or attempt to find an outside purchaser. Minority stockholders had a special problem, because they could not sell control with their stock.

"The holding company was regarded by many stockholders as an attractive device to solve the problem of the marketability of their shares. Through this method, the control of one, two, or several associations could be consolidated and offered to the investing public in a single large stock issue at relatively low prices, either over the counter or through a stock exchange. The wide public ownership of holding company shares would thus provide a more active market and more protection against large capital losses in the event the original owners or their heirs wished to sell their holding company stock.

"Large capital gains on the sale of holding company stock to the public have been an important incentive and consequence of this form of organization. The issuance of holding company stock to the general public usually found an enthusiastic demand which made it possible to sell the stock for as much as two to three times book value. In many but not all cases the majority stockholders in the original associations have offered less than 50 percent of the holding company's stock to the public, thus retaining control of the association and the holding companies." (The Savings and Loan Industry in California (1960) pp. VI-6-VI-7.) Although defendants suggest that their transfer of the insurance businesses and the later acquisition of another savings and loan association by United Financial were necessary to the creation of a market for United Financial shares and that no market could be created for the shares of a single savings and loan association, the study does not support their claim. Whether defendants could have created a market for a holding company that controlled a single association or reasonably believed that they could not, goes to their good faith and to the existence of a proper business purpose for electing the course that they chose to follow. At the trial of the cause defendants can introduce evidence relevant to the necessity for inclusion of other businesses.

dismissal after the defendants' demurrer was sustained we decide only that the complaint states a cause of action entitling plaintiff to relief.

 Defendants gained an additional advantage for themselves through their use of control of the Association when they pledged that control over the Association's assets and earnings to secure the holding company's debt, a debt that had been incurred for their own benefit.[14] In so doing the defendants breached their fiduciary obligation to the minority once again and caused United Financial and its controlling shareholders to become inextricably wedded to a conflict of interest between the minority stockholders of each corporation. Alternatives were available to them that would have benefited all stockholders proportionately. The course they chose affected the minority stockholders with no less finality than does dissolution (*In re Security Finance Co., supra,* 49 Cal.2d 370) and demands no less concern for minority interests.

 In so holding we do not suggest that the duties of corporate fiduciaries include in all cases an obligation to make a market for and to facilitate public trading in the stock of the corporation. But when, as here, no market exists, the controlling shareholders may not use their power to control the corporation for the purpose of promoting a marketing scheme that benefits themselves alone to the detriment of the minority. Nor do we suggest that a control block of shares may not be sold or transferred to a holding company. We decide only that the circumstances of any transfer of controlling shares will be subject to judicial scrutiny when it appears that the controlling shareholders may have breached their fiduciary obligation to the corporation or the remaining shareholders.

## IV

### Damages

. Plaintiff contends that she should have been afforded the opportunity to exchange her stock for United Financial shares at the time of and on the same basis as the majority exchange. She therefore proposes that upon tender of her Assocation stock to the defendants she be awarded the fair market value of a derived block of United Financial shares during 1960-1962 plus interest from the date of her action as well as a return of capital of $927.50 plus interest from the date the same was made to the former

---

[14]Should it become necessary to encumber or liquidate Association assets to service this debt or to depart from a dividend policy consistent with the business needs of the Association, damage to the Association itself may occur. We need not resolve here, but note with some concern, the problem facing United Financial, which owes the same fiduciary duty to its own shareholders as to those of the Association. Any decision regarding use of Association assets and earnings to service the holding company debt must be made in the context of these potentially conflicting interests.

majority shareholders. In addition she seeks exemplary damages and other relief.

Defendants, on the other hand, claim that plaintiff seeks a "free ride" after they have taken all of the risks in creating United Financial and marketing its stock. They maintain that plaintiff has not been damaged by their conduct and that they have breached no duty owed to plaintiff and the other minority stockholders. We are thus without guidance from defendants as to the remedy that a court of equity might appropriately fashion in these circumstances.

From the perspective of the minority stockholders of the Association, the transfer of control under these circumstances to another corporation and the resulting impact on their position as minority stockholders accomplished a fundamental corporate change as to them. Control of a closely held savings and loan association, the major portion of whose earnings had been retained over a long period while its stockholders remained stable, became an asset of a publicly held holding company. The position of the minority shareholder was drastically changed thereby. His practical ability to influence corporate decisionmaking was diminished substantially when control was transferred to a publicly held corporation that was in turn controlled by the owners of more than 750,000 shares.[15] The future business goals of the Association could reasonably be expected to reflect the needs and interest of the holding company rather than the aims of the Association stockholders thereafter. In short, the enterprise into which the minority stockholders were now locked was not that in which they had invested.

The more familiar fundamental corporate changes, merger, consolidation, and dissolution, are accompanied by statutory and judicial safeguards established to protect minority shareholders. (Corp. Code, §§ 4100-4124, 4600-4693.) Shareholders dissenting from a merger of their corporation into another may demand that the corporation purchase their shares at the fair market value. (Corp. Code, § 4300.) If the shareholders and the corporation fail to agree on that value, the shareholders may call upon the court, which may in turn appoint independent appraisers to assist in evaluating the shares. (Corp. Code, §§ 4306, 4308, 4310.) This procedure makes possible determination of value unaffected by any market distortion caused by the merger (*Gallois* v. *West End Chemical Co.*, 185 Cal.App.2d 765 [8 Cal.Rptr. 596]) and enables stockholders in a closely held corporation whose shares are not publicly marketed to obtain an independent judgment as to the value of their shares. Protection of

---

[15]Although the H. F. Ahmanson & Co. owned a majority of the Association stock prior to the exchange, it appears that this company was privately held for the benefit of the Ahmanson family.

shareholder interests is achieved in voluntary corporate dissolution by judicial supervision to assure equitable settlement of the corporation's affairs. (Corp. Code, § 4607; *In re Security Finance Co., supra,* 49 Cal.2d 370.)

Judicial protection has also been afforded the shareholder who is the victim of a "de-facto merger" to which he objects. In *Farris* v. *Glen Alden Corp.,* 393 Pa. 427 [143 A.2d 25], the Supreme Court of Pennsylvania extended the right theretofore given to shareholders dissenting from a merger to the shareholders of a corporation that had agreed to acquire all of the assets of another corporation in exchange for stock. The court noted that while shareholders were not entitled under the Pennsylvania Business Corporation Law to dissent if the corporation acquired the assets of another corporation without more, where the transaction had the effect of a merger the shareholders should have been given the rights of dissent and appraisal.

Appraisal rights protect the dissenting minority shareholder against being forced to either remain an investor in an enterprise fundamentally different than that in which he invested or sacrifice his investment by sale of his shares at less than a fair value. (O'Neal and Derwin, Expulsion or Oppression of Business Associates (1961), *supra,* 62.) ▮▮ Plaintiff here was entitled to no less. But she was entitled to more. In the circumstances of this case she should have been accorded the same opportunity to exchange her Association stock for that of United Financial accorded the majority.

▮▮ Although a controlling shareholder who sells or exchanges his shares is not under an obligation to obtain for the minority the consideration that he receives in all cases, when he does sell or exchange his shares the transaction is subject to close scrutiny. When the majority receives a premium over market value for its shares, the consideration for which that premium is paid will be examined. If it reflects payment for that which is properly a corporate asset all shareholders may demand to share proportionately. (*Perlman* v. *Feldmann, supra,* 219 F.2d 173 [50 A.L.R.2d 1134].) ▮▮ Here the exchange was an integral part of a scheme that the defendants could reasonably foresee would have as an incidental effect the destruction of the potential public market for Association stock. The remaining stockholders would thus be deprived of the opportunity to realize a profit from those intangible characteristics that attach to publicly marketed stock and enhance its value above book value. Receipt of an appraised value reflecting book value and earnings alone could not compensate the minority shareholders for the loss of this potential. Since the damage is real, although the amount is speculative, equity demands that

the minority stockholders be placed in a position at least as favorable as that the majority created for themselves.

If, after the trial of the cause, plaintiff has established facts in conformity with the allegations of the complaint and stipulation, then upon tender of her Association stock to defendants she will be entitled to receive at her election either the appraised value of her shares on the date of the exchange, May 14, 1959, with interest at 7 percent a year from the date of this action, or a sum equivalent to the fair market value of a "derived block" of United Financial stock on the date of this action with interest thereon from that date, and the sum of $927.50 (the return of capital paid to the original United Financial shareholders) with interest thereon from the date United Financial first made such payments to its original shareholders, for each share tendered. The appraised or fair market value shall be reduced, however, by the amount by which dividends paid on Association shares during the period from May 14, 1959, to the present exceeds the dividends paid on a corresponding block of United Financial shares during the same period.

## V
### *The Cartwright Act*

Plaintiff contends that the stipulated facts and the allegations of the complaint also state a cause of action for restraint of trade in violation of the Cartwright Act. (Bus & Prof. Code, §§ 16720-16758.) That Act makes unlawful any "trust" (Bus. & Prof. Code, § 16726), defined as a "combination of capital, skill or acts by two or more persons for [inter alia] the following purposes: (a) To create or carry out restrictions in trade or commerce . . . (c) To prevent competition in . . . purchase of . . . any commodity." (Bus. & Prof. Code, § 16720.) Defendants do not contend that shares of stock are not a commodity within the contemplation of the Legislature when it adopted the Cartwright Act. We assume *arguendo* that the Cartwright Act applies to transactions in corporate shares.

Plaintiff has alleged that "the Delaware Exchange comprised an agreement to combine and a combination of the participants' capital and interest in Association guarantee stock which prevented and precluded free and unrestricted competition among themselves in the purchase of a commodity to wit: ASSOCIATION guarantee stock." (Complaint, par. III.) Read in conjunction with the further allegation that defendants comprised 95 percent of the market for guarantee stock the complaint thus alleges in substance that the effect of the defendants' action was to prevent competition in the only existing market for Association stock. The complaint does not allege, however, that this was a purpose of the defendants' actions or that defendants agreed among themselves not to purchase further shares of Association stock from the minority stockholders. Even accorded the liberal construction of pleadings required by section 452 of the Code of

Civil Procedure, the allegations of the complaint when read in their entirety fail to supply the necessary element of purpose. ■ A cause of action for restraint of trade under the Cartwright Act or common law principles must allege both a purpose to restrain trade and injury to the business of the plaintiff traceable to actions in furtherance of that purpose. (Bus. & Prof. Code, § 16756; *Speegle* v. *Board of Fire Underwriters,* 29 Cal.2d 34, 41 [172 P.2d 867]; *Willis* v. *Santa Ana etc. Hospital Assn.,* 58 Cal.2d 806, 810 [26 Cal.Rptr. 640, 376 P.2d 568].)

■ Although it may be sufficient in some instances to allege solely the effect of such combination from which a purpose to eliminate competition may be inferred, when, as here, the defendant is alleged to have become the sole market for shares of stock of a single, closely held corporation and a purpose unrelated to eliminaton or reduction of competition affirmatively appears on the face of the complaint no such inference will be drawn. Failure of the plaintiff to allege either an agreement among the defendants not to purchase shares of Association stock for their own accounts or that this was a purpose of the transfer of their shares to United Financial renders the complaint insufficient insofar as it purports to state a cause of action for relief under the Cartwright Act. The lack of factual allegations of specific conduct directed toward furtherance of a conspiracy to eliminate or reduce competition in the trading of Association stock renders the complaint insufficient. (*Chicago Title Ins. Co.* v. *Great Western Financial Corp.,* 69 Cal.2d 305, 327 [70 Cal.Rptr. 849, 444 P.2d 481].)

## VI

### Defendants' Appeal

■ Defendants appeal from the judgment "only with respect to the overruling by the court of the . . . specifications of" the demurrer based on laches, uncertainty in designation of the identity and number of persons constituting the class plaintiff purports to represent, and failure to separately state multiple causes of action. An order overruling a demurrer is not appealable. (Code Civ. Proc., § 904.1 [formerly § 963]. See 3 Witkin, Cal. Procedure (1954) Appeal, § 19(a).) Although the judgment from which defendants appeal recites the order overruling the demurrer, the order remains interlocutory and nonappealable.

Inasmuch as the questions may arise again on appeal from the final judgment, however, we deem it appropriate to comment on defendants' contentions.

### Laches

■ The exchange of Association stock for United Financial stock

by defendants occurred on May 14, 1959. The first public offering of United Financial stock and sale of the debentures followed on or about June 10, 1960. United Financial's offer to the minority stockholders to purchase their stock was made in September 1960. The application for a permit to exchange United Financial shares for Association stock held by the minority stockholders was filed on August 21, 1961, and the hearings thereon were held on September 29 and October 11, 1961. United Financial's request that the application be withdrawn followed. The plaintiff commenced this action on January 30, 1962.

The delay in initiating this action was not so long as to be unreasonable and to constitute laches as a matter of law. ■ It is well established that mere lapse of time without showing of prejudice to the defendant does not constitute laches. (*Gerhard* v. *Stephens,* 68 Cal.2d 864, 904 [69 Cal.Rptr. 612, 442 P.2d 692]; *Beverage* v. *Canton Placer Min. Co.,* 43 Cal.2d 769, 777 [278 P.2d 694]; *Maguire* v. *Hibernia Sav. & Loan Soc.,* 23 Cal.2d 719, 746 [146 P.2d 673, 151 A.L.R. 1062]; *McGibbon* v. *Schmidt,* 172 Cal. 70 [155 P. 460].) ■ Since prejudice to the defendants does not appear from the complaint and stipulated facts, the order of the trial court overruling the demurrer on that ground was proper.

### The Class Represented by Plaintiff

■ ■ Defendants complain that plaintiff's definition of the class she purports to represent as "all of that portion of the other minority stockholders who are similarly situated who wish to rely thereon and who agree to compensate Plaintiff and her attorneys for reasonable attorneys' fees in an amount to be determined by the Court after trial" is "too ill-defined and ephemeral in make-up" to constitute a class for the purpose of a class action. They base this contention on the holding of the United States Court of Appeals for the Third Circuit in *Giordano* v. *Radio Corp. of America,* 183 F.2d 558, 560-561, that a class composed of persons who "are in agreement with the plaintiff" cannot constitute a class for this purpose.

Defendants' reliance on that case is misplaced. Plaintiff here designates the class as the minority stockholders of the Association. Those similarly situated are easily identified as all of those persons who continued to hold Association stock subsequent to the defendants' exchange of shares for United Financial shares. There is no suggestion that the class is limited to persons who agree with the plaintiff. The further identification of the class as those persons who agree to share in plaintiff's litigation expense does no more than state the applicable rule with regard to equitable apportionment of the litigation expenses incurred by a plaintiff who successfully prosecutes an action on behalf of a class. (*Sprague* v. *Ticonic Nat. Bank,* 307 U.S. 161, 166 [83 L.Ed. 1184, 1186, 59 S.Ct. 777]; *Estate of Reade,* 31 Cal.2d

669, 672 [191 P.2d 745]; *Farmers etc. Nat. Bank* v. *Peterson*, 5 Cal.2d 601, 607 [55 P.2d 867].)

The rule of this jurisdiction with respect to class actions is found in section 382 of the Code of Civil Procedure, which provides in relevant part: ". . . when the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all." We have held that the two requisites of a class action under this section are an "ascertainable class . . . and . . . a well defined community of interest in the questions of law and fact involved affecting the parties to be represented." (*Daar* v. *Yellow Cab Co.*, 67 Cal.2d 695, 704 [63 Cal.Rptr. 724, 433 P.2d 732].) It is apparent that the requisite community of interest exists among the minority shareholders of the Association and that the class is readily ascertainable. The demurrer was properly overruled.

Our holding that plaintiff's complaint fails to state a cause of action for restraint of trade disposes of defendants' further contention that the complaint fails to separately state multiple causes of action.

The judgment appealed from by plaintiff is reversed. The trial court is directed to overrule the demurrer in conformity with this opinion. Defendants' appeal is dismissed.

Peters, J., Tobriner, J., Burke, J., Sullivan, J., and Coughlin, J. pro tem.,* concurred.

McCOMB, J.—I dissent. I would affirm the judgment in favor of defendants for the reasons expressed by Mr. Justice Shinn and Mr. Justice Moss in the opinions prepared by them for the Court of Appeal in *Jones* v. *H. F. Ahmanson & Co.*, (Cal.App.) 76 Cal.Rptr. 293.

The petition of the defendants and appellants for a rehearing was denied December 10, 1969, and the opinion was modified to read as printed above. Coughlin, J. pro tem.,* sat in place of Mosk, J., who deemed himself disqualified. McComb, J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairman of the Judicial Council.