**BEVERLY HILLS FEDERAL SAVINGS AND LOAN ASSOCIATION, Plaintiff,**

v.

**FEDERAL HOME LOAN BANK BOARD et al., Defendants.**

**Civ. No. 62–305–RJK.**

United States District Court, C. D. California.

April 25, 1973.

Ball, Hunt, Hart, Brown & Baerwitz by Clark Heggeness, Long Beach, Cal., for plaintiff Beverly Hills Fed. Sav. and Loan Ass'n.

John Whyte, Ira S. Carlin, Beverly Hills, for defendants Eugene Webb, Jr. [now deceased], Marguerite R. Webb [now known as Marguerite R. Schneider], Richards Matthews, Jr., Robert G. Rufi and Eugene C. Jones.

Hill, Farrer & Burrill by William M. Bitting, Los Angeles, Cal., Special Counsel for defendant Federal Home Loan Bank Bd.

Paul, Hastings, Janofsky & Walker, Lee G. Paul, Robert G. Lane, Douglas C. Conroy, Los Angeles, Cal., for defendant Title Ins. and Trust Co.

Joseph T. Thompson, Beverly Hills, Cal., for defendant Title Ins. and Trust Co., a corporation, as Executor of the Will of Eugene Webb, Jr., deceased, and for defendant Bank of America Nat. Trust & Savings Ass'n, Administrator with Will Annexed.

Robert E. Brimberry, Los Angeles, Cal., for defendants Marguerite R. Schneider (both individually and as a trustee of Trust No. PP–13444) Robert G. Rufi and Eugene C. Jones.

## MEMORANDUM OF DECISION

KELLEHER, District Judge.

Plaintiff, Beverly Hills Federal Savings and Loan Association (hereinafter "the Association"), invoking the jurisdiction provided under 12 U.S.C. § 1464(d)(1), The Home Owners Loan Act of 1933, as amended, commenced this action on February 20, 1962, by filing a complaint for declaratory relief under 28 U.S.C. §§ 2201 and 2202, against the Federal Home Loan Bank Board (hereinafter "the Bank Board").

By leave of Court, the Association, on April 23, 1962, filed an amended and supplemental complaint for a declaratory judgment, to impress a trust and for other relief, which named as additional defendants: Eugene Webb, Jr., Marguerite R. Webb, Richards Matthews, Jr., Robert G. Rufi and Eugene C. Jones (hereafter "the Webb group"). Therein it was alleged that in March 1961 the Webb group transferred control of the Association to: Lytton Financial Corporation, Bart Lytton, Beth Lytton, Thomas W. Clarke, Samuel J. Sills, H. P. Braman and Glenn Wilson (hereinafter "the Lytton group"), and that defendants Eugene Webb, Jr., and his wife sold to the Lytton group the capital stock of the Southland Company (hereinafter "Southland"), a firm organized by the Webbs to handle the escrow, trust deed and insurance business generated by the Association. Incorporating in the amended and supplemental complaint two resolutions of the Bank Board, dated January 26, 1962, and March 30, 1962, the Association claimed that these transactions were unlawful and violated rules and regulations of the Bank Board, that members of the Webb group violated their fiduciary duties to the Association and improperly profited by these transactions and that the Lytton group was at fault by participating in these transactions. Thereafter, the Bank Board cross-claimed against the Webb and Lytton groups for general and punitive damages and declaratory relief.

In January 1965 the Association and the Bank Board settled their claims against the Lytton group who then were dismissed from the action. *See*, Webb v. Beverly Hills Federal Savings and Loan Ass'n, 364 F.2d 146 (9th Cir. 1966).

Thereafter, in May 1965, the Association filed its second amended and supplemental complaint against the Webb group seeking substantially the same relief as sought by the Bank Board in its cross-claim. A dismissal for lack of subject matter jurisdiction was entered as to the second amended and supplemental complaint insofar as it asserted a claim by the Association against the Webb group; on appeal the order of dismissal was reversed. *See*, Beverly Hills Federal Savings and Loan Ass'n v. Webb, 406 F.2d 1275 (9th Cir. 1969). After filing of amended cross-claims by the Bank Board, this trial followed.

The Association, formerly Southland Federal Savings and Loan Association, is a federally chartered savings and loan association existing by virtue of the Home Owners Loan Act of 1933, as amended, 12 U.S.C. § 1464. Prior to March 14, 1961, the Webb group, defendants Eugene Webb, Jr., Marguerite R. Webb, Richards Matthews, Jr., Robert G. Rufi and Eugene C. Jones, constituted the Board of Directors of the Association. Eugene Webb, Jr., was president of the Association, his wife, Marguerite R. Webb, was chairman of the board of directors, and his nephew, Richards Matthews, Jr., was vice-president.

For many years prior to March 14, 1961, the depositors and borrowers of the Association, as a matter of routine, as requested by the Association in connection with deposits and loan transactions, had signed proxies appointing Mr. Webb, and in his absence, Mrs. Webb, and in the absence of both, Richards Matthews, Jr., Eugene Webb, III, the Webb's son, and Robert G. Rufi, Mrs. Webb's brother, in the order named. At all times while the proxies were in effect, the Webb group was able to and

did exercise thereby effective control of the Association.

From about 1949 to 1958 the Webbs owned, operated and managed the Southland Mortgage Company to which loan escrows handled by the Association were referred. Upon the advice of tax counsel, Mr. and Mrs. Webb dissolved and liquidated Southland Mortgage Company in 1958 and incorporated the Southland Company as a California corporation. Southland was capitalized at $5,000.00. At the same time, the Webbs transferred their stock certificates, representing the whole of the outstanding shares of Southland, to themselves and defendant Title Insurance and Trust Company as trustees thereof. The beneficiaries of the trust were and are the Webb children, Beverly Diana Marguerite Webb and Eugene Webb, III.

Between 1958 and 1961 and for a period thereafter, Southland leased from the Association offices adjacent to those of the Association and operated as a mortgage escrow service company. In addition to acting as escrow agent and trustee under deeds of trust for the Association, Southland wrote insurance policies for the Association's borrowers on a commission basis. With very few or no exceptions, these activities were the sole source of Southland's income.

During 1959 and 1960, Mr. Webb, then approaching seventy years of age, contemplated retirement. He approached a number of persons in the savings and loan business. Sometime in early 1961 he met with Thomas Clarke who was at the time senior vice-president, general counsel and a director of Lytton Financial Corporation. Initially, Mr. Webb proposed that Mr. Clarke become president of the Association, requiring, however, an assurance from Clarke that the existing relationship between the Association and Southland would continue.

Prior to these discussions Mr. Clarke had never heard of Southland and knew nothing of its operations. He told Mr. Webb that as a corporate officer and director of the Lytton group he felt obliged to bring the discussions with Mr. Webb to Lytton's attention as a corporate opportunity. Mr. Webb replied that he was not interested in dealing with the Lytton group, that he had built up the Association over a period of several years and that he had always taken pride in its operations; Mr. Webb acknowledges that he did not, at the time he initiated his discussions with Mr. Clarke, have a high regard for the Lytton group's method of operations. Nonetheless, discussions between Mr. Webb and Mr. Clarke continued during 1960.

Shortly after this series of discussions began, Mr. Clarke made clear that he was speaking for the Lytton Financial Corporation and asked Mr. Webb whether Southland could be purchased and, if so, at what price. Mr. Webb replied that Southland could be purchased for a reasonable multiple of Southland's earnings for the previous twelve months. Thereafter, Mr. Webb, Mr. Clarke and Mr. Bart Lytton, the chief executive officer of the Lytton group, met several times to discuss the transaction. On one such occasion and upon the inquiry of Mr. Clarke, Mr. Webb expressed a willingness to assign the proxies of the Association, which he held, to Mr. Lytton or to whomever Mr. Clarke should designate.

These discussions culminated in a written Buy and Sell Agreement, executed on March 9, 1961, whereby the Webbs (together with Title Insurance and Trust Company, as trustees for the benefit of the Webb children) contracted for the sale of all outstanding and issued stock of Southland to Lytton Financial Corporation for a stated consideration of $1,500,000. The agreement provided, among other things, that the Webbs would do "any and all things necessary, and execute any and all necessary documents or agreements, as may be required by the buyer, in order to assure the continuance of the present business relationship between the Southland Company and the Beverly Hills Federal Savings and Loan Association."

Five days later, on March 14, 1961, the Webbs executed a "Personal Service Agreement" and covenant not to compete between themselves and Lytton, which was controlled by Mr. Lytton. This agreement provided, among other things, for payment to Mr. and Mrs. Webb of $60,000.00 per year for a period of five years, regardless of whether Mr. Webb lived or not, with the first payment due upon the execution of the Personal Service Agreement. Pursuant to this agreement, the Webbs received a total of $300,000.00 despite the fact that they performed no significant services for Lytton or anyone else. On the same day all members of the Webb group executed a Substitution of Proxy Agreement in favor of Bart Lytton, Beth Lytton, Dr. Samuel J. Sites and Thomas W. Clarke, in the order named, whereby the proxies received from depositors and borrowers of the Association and held by the Webb group were transferred to the control of the Lytton group. Also, on March 14, 1961, Mr. Webb, as chairman of the Association's board of directors, convened a meeting of the Association's directors at which members of the Lytton group were elected to the board in place of the Webb group. Initially, Mr. Clarke acted as president of the Association and Mrs. Lytton as chairman of the board.

On January 26, 1962, the Federal Home Loan Bank Board adopted Board Resolution No. 15,430, pursuant to Section 5(b)(1) of the Home Owners Loan Act of 1933, as amended. This resolution, in substance, referred to the foregoing events and recited certain actions regarded as improper on the part of the various parties to these transactions, including members of the Webb group and the Lytton group. The resolution was served upon all members of these groups, who were given thirty days within which to correct their alleged violations of law and the regulations of the Federal Home Loan Bank Board.

On February 20, 1962, the Association, invoking 12 U.S.C. § 1464(d)(1), filed in this Court its Complaint for Declaratory Relief. Thereafter, on March 30, 1962, the Board adopted Resolution No. 15,703 which asserted that the foregoing transactions were unlawful and that by participating therein the Webb group had violated their fiduciary duties to the members of the Association and improperly profited from the transaction.

Subsequently, the Association filed a first amended complaint adding the members of the Webb and Lytton groups as parties defendant. The Board answered on July 2, 1962, reasserting its position that the transaction was illegal and cross-claimed against the Webb and Lytton groups asking, among other things, that (1) the Association, through the then-managing Lytton group, be ordered to correct such alleged violations of law as are found to exist in connection with the transfer of control of the Association to the Lytton group, (2) all individual party defendants be barred from serving in a capacity of trust and responsibility as an officer, director or party otherwise connected with the management and control of the Association for five years, (3) punitive damages be awarded against certain members of the Lytton and Webb groups for willful and deliberate disregard of their fiduciary duties to the Association and willful disregard for the requirements of applicable laws and regulations, (4) defendants Eugene Webb, Jr., and Marguerite R. Webb be deemed to hold in constructive trust for the benefit of the Association, the sum of $1,620,000.00 and any other sum which may have been received by them as a consideration for the transfer of control of the Association to the Lytton group, and (5) the Association be awarded general damages against the Webbs.

The pleadings remained in this status until January 1965. As hereinabove noted, settlement was then entered into between the Board and the Lytton group. The latter agreed to relinquish management of the Association. The stipulation provided that the Court would be requested to enter a judgment of dismissal as to the Lytton group only

and that the settlement would not affect the rights or obligations of any other parties. On January 14, 1965, a stipulated judgment to that effect was entered. The Webb group appeal from this judgment was dismissed by the Court of Appeals. Webb v. Beverly Hills Federal Savings and Loan Association, 364 F.2d 146 (9th Cir. 1966).

A new board of directors of the Association was elected as part of the settlement agreement. This board approved the settlement including payment by the Association to Lytton of the sum of $1,875,000.00 and the filing of the second amended and supplemental complaint referred to above.

In addition to the Webb group, the Association named as defendant the Title Insurance and Trust Company (hereinafter Title Company) to whom, as co-trustees with themselves, the Webbs had transferred the shares of Southland and to whom the cash consideration for the sale of the shares was thereafter paid by Lytton. See, Beverly Hills Federal Savings and Loan Ass'n v. Webb, 406 F.2d 1275, 1279 (9th Cir. 1969).

In November 1966 the Board filed its answer admitting all allegations of the second amended and supplemental complaint and filed amended cross-claims against the Webb group alleging that the members thereof constituted the board of the Association for a considerable time prior to March 1961 and that, among other things, they knowingly breached their fiduciary responsibilities of loyalty and good faith by the assignment of proxies to the Lytton group and that the transactions of March 9 and March 14, 1961, were tantamount to a sale of an asset of the Association and were undertaken in unlawful disregard of the Board's rules and regulations.

The Board's amended cross-claims seek injunctive relief against the Association, including: (1) disclosure of the Webb group's alleged breach of trust; (2) an order barring the Webb group from any further connection with the Association; and (3) an order enjoining the Association from reimbursing the Webb group for any of their legal expenses or fees in connection with these proceedings. Further, the Board seeks punitive damages against the Webbs for their alleged breach of trust and imposition of a constructive trust upon the $1,800,000.00 paid by Lytton Financial to the Webbs and Title Co., as well as general damages and costs of suit. In their answer, filed March 3, 1969, to the second amended and supplemental complaint and the amended cross-claims of the Board, the Webb group asserted counterclaims for a set-off against any sum recovered from the Webb trust or any member of the Webb group equal to:

(1) the monetary value of Southland as of March 14, 1961; and

(2) the monetary value of the consideration furnished by the Association and the Board in connection with their 1965 settlement with the Lytton group and Lytton Financial.

As noted at the outset of this memorandum, jurisdiction of this Court is invoked under the Home Owners Loan Act of 1933, as amended, 12 U.S.C. § 1464 and § 1464(d)(1), and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

■ Under the Home Owners Loan Act the Board is charged with the supervision and regulation of federal savings and loan associations, 12 U.S.C. § 1461; Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); Home Loan Bank Board v. Mallonee, 196 F.2d 336, 390 (9th Cir. 1952). Section 5(d)(1) of the Act, 12 U.S.C. § 1464(d)(1), permits both the Board and the affected Association equal access to the District Court for the enforcement of duties imposed by the Act. Beverly Hills Federal Savings and Loan Ass'n v. Webb, 406 F.2d 1275 (9th Cir. 1969).

Section 5(d)(1) of the Act provides, in relevant part:

"The board shall have power to enforce this section and rules and regulations made hereunder. In the enforcement of any provisions of this

section or rules and regulations made hereunder, or any other law or regulation, or in any other action, suit, or proceeding to which it is a party or in which it is interested, and in the administration of conservatorships and receiverships, the Board is authorized to act in its own name, and through its own attorneys. 12 U.S.C. § 1464(d)(1)."

In construing the language of the statute as a whole, the Ninth Circuit Court of Appeals has held:

" . . . [I]t is manifest that Congress envisioned a strong Bank Board with broad regulatory power to redeem and make viable the initial condition of charter issuance that 'primary consideration [be given] to the best practices of local mutual thrift and home-financing institutions in the United States. . . . ' " Reich v. Webb, 336 F.2d 153, 158 (9th Cir. 1964).

■ Accordingly, the Court of Appeals held that Administrative enforcement of the Act is not limited to the remedies expressly provided therein. If the remedy sought by the Board is within the general enforcement powers contemplated by the statute, then the Board has broad power in fashioning the appropriate relief.

"We therefore conclude that, in view of the considerations above noted, the language in 12 U.S.C. § 1464(d)(1) 'or any other law' includes common law fiduciary responsibilities which the Bank Board is empowered to enforce through appropriate court action. To hold otherwise would render the language 'or any other law' mere surplusage." Reich v. Webb, 336 F.2d 153 (9th Cir. 1964).

■ Defendants urge that Congress has pre-empted the field with regard to the operation, regulation and control of federal savings and loan associations and unless specific regulations adopted pursuant to the Act proscribe conduct relating to the operation and control of federal savings and loan associations

then such conduct is not unlawful. Not only does the Court consider this contention to have been expressly rejected in Reich v. Webb, 336 F.2d 153 (9th Cir. 1964), but the Court is unable to find judicial support for defendants' argument in the authorities they have cited to the Court in support of their pre-emption theory.

In People v. Coast Federal Sav. & Loan Ass'n, 98 F.Supp. 311 (S.D.Cal. 1951), the Superintendent of Banks of the State of California sought injunctive relief and statutory penalties against a federally chartered savings and loan association which had allegedly solicited and received deposits, representing itself to be a banking institution and transacting business in the manner of a savings bank, without having received a certificate therefor from the Superintendent. No evidence was offered to support a finding by the District Court that defendant had exceeded the authority conferred on it by virtue of its charter from the Home Loan Bank Board. The Court held that the Superintendent's attempted imposition of potentially conflicting and inconsistent regulations on the operation of a federally chartered savings and loan association would intrude upon the comprehensive regulatory scheme established by the Board and, hence, was contrary to the manifest purpose and intent of the Act. People v. Coast Federal Sav. & Loan Ass'n, *supra,* thus, stands for the exclusivity of federal regulation over federally chartered savings and loan associations. However, it does not preclude the federal regulatory agency itself from adopting or imposing standards derived from state or general common law principles to effectuate policies implicit in the Act.

Of similar import is the other principal authority cited by defendants in support of their pre-emption theory, Murphy v. Colonial Federal Savings and Loan Association, 388 F.2d 609 (2d Cir. 1967), which held that a declaratory relief action by dissident members of a federally chartered savings and loan association seeking a membership list

from management posed federal law issues. Defendants interpret this case as holding that such issues may not be decided with reference to what Mr. Justice Jackson has termed "the source materials of the common law," D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 469, 62 S.Ct. 676, 685, 86 L.Ed. 956 (1942).

■■ Nothing in the cases cited by defendants leads this Court to the conclusion that a federal regulatory scheme does not embrace fundamental principles of the common law consistent with policies of the regulatory scheme and necessary for their implementation. Indeed, quite the contrary would seem to be the case. In D'Oench, Duhme & Co. v. Federal Deposit Insurance Corp., *supra,* the Supreme Court unanimously held that an accommodation maker of a note could not assert a defense of no consideration in an action by a federal agency to which the note had been assigned and though the Court's opinion does not make completely apparent the basis of the Court's decision, Mr. Justice Jackson's concurrence noted:

> "A federal court sitting in a non-diversity case such as this does not sit as a local tribunal. In some cases it may see fit for special reasons to give the law of a particular state highly persuasive or even controlling effect, but in the last analysis its decision turns upon the law of the United States, not that of any state. Federal law is no judicial chameleon changing complexion to match that of each state wherein lawsuits happen to be commenced because of the accidents of service of process and of the application of the venue statutes. It is found in the federal Constitution, statutes, or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common law technique of decision and to draw upon sources of the common law in cases such as

the present." 315 U.S. at 471–72, 62 S.Ct. at 686.

Accordingly, the Court deems that the duties and responsibilities imposed upon fiduciaries and those in positions of trust by generally accepted and applied common law principles are implicit in the Act and the regulations promulgated thereunder by the agency responsible for enforcement and implementation of the Act.

Long after the post-trial submission of the case for decision the Webb defendants and Title Insurance and Trust Co. urged upon the Court the opinion in Hughes Tool Company, et al. v. Trans World Airlines, Inc., 409 U.S. 363, 93 S. Ct. 647, 34 L.Ed.2d 577 (1973), as significant. The Court has considered *Hughes Tool Co.* and the related cases and concludes that there has been no preemption here so as to exclude the defendants from accountability for breach of duties created other than by the federal statutes and regulations of the Board.

■ There can be no question that as officers, directors and proxy holders, the members of the Webb group stood in a position of trust and confidence with the Association's members and owed them those obligations commonly associated with fiduciaries and, hence, the sale or appropriation by the Webb group of an asset rightfully belonging to the Association and its members constitutes a breach of this duty. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955), cert. denied, 349 U. S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), Jones v. H. F. Ahmanson & Company, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969). No known cases deal directly with the transfer of proxies of a federally chartered savings and loan association; however, the sale or transfer of control of a corporation at a premium and the transfer of corporate offices for a consideration without complete disclosure to minority shareholders has been widely held to constitute a

breach of the majority's duty to the minority. The duties of good faith and fair dealing owed by the Webb group to members of the Association cannot be any less than that owed by majority shareholders since the proxies in the Association, unlike majority shareholders' bloc of stock, were not the property (so far as they are "property") of the Webb group but of the Association's members.

The Webb group contends that even if there were a transfer of control of the Association by reason of the events of March 1961, such a transfer does not constitute a breach of the Webb group's fiduciary responsibilities, laying stress on the fact that Perlman v. Feldmann, *supra,* does not expressly appear to prohibit the sale of corporate control at a premium absent the appropriation of a corporate asset, looting or similar factors indicating unfair dealing by the majority. Even conceding that majority shareholders may be allowed to obtain a premium solely for control of the corporation, absent unfair dealing, the entitlement to such a premium inures to the majority's rightful ownership of the control bloc of stock. No analogous entitlement inured to the Webb group by virtue of their holding of the proxies of the Association's members since the Webb group did not lawfully own the proxies but were merely entrusted with them.

Because the Webb group had no right of ownership in control of the Association, the Court regards the sale of stock constituting control of a corporation is readily distinguishable from the transfer of control of a mutual thrift association. Moreover, despite the absence of case law or statutory authority directly on point, it is inconceivable to the Court that the law would not impose at least as stringent fiduciary standards of conduct on persons in effective control of federally chartered savings and loan associations as it does on persons in control of a corporation.

Principles of equity have long recognized that a trustee or other person standing in a fiduciary relationship may not sell, assign or transfer his position for personal gain.

"A fiduciary endeavoring to influence the selection of a successor must do so with an eye single to the best interests of the beneficiaries. Experience has taught that, no matter how high-minded a particular fiduciary may be, the only certain way to insure full compliance with that duty is to eliminate any possibility of personal gain." Rosenfeld v. Black, 445 F.2d 1337, 1342 (2d Cir. 1971).

As officers and directors of the Association, the Webb group was entrusted with the power and authority of the Association's affairs. As holders of proxies, the Webb group was able to determine the make-up of the Board and the officer group. The very nature of the Webb group's relationship to the Association for almost twenty-five years prior to 1961 clearly establishes that the Webb group had almost complete control of the Association and direction of mortgage, escrow, title and related business by the Association to the Southland Company and its predecessor, both owned by the Webbs. The fact that several of the officers and directors of the Association were related by blood or marriage to Mr. and Mrs. Webb are obvious incidents of the control exerted by the Webbs. Defendants argued during trial that the proxies held by the Webb group were revocable at any time by the Association's members so that real control remained with the membership and was not reposed in the Webbs. While it is true as a theoretical proposition that ultimate control always rested with the Association's members in that they could have revoked their proxies, the practical likelihood of such an occurrence was at all times virtually nil. In determining the scope of a fiduciary's duties, courts are not and cannot be blind to the realities of business life. Indeed, the finding of control by the Webb group is fortified by the insistence of the Lytton group that the Buy/Sell Agreement for the sale of Southland Company stock

contain a covenant not to compete executed by the Webbs, and be accompanied by a document assigning proxies to the Lytton group and a personal service contract with the Webbs. Only by structuring the deal in this manner could the Lytton group be assured that the Webbs would not direct satellite business to another service company.

Taken together, the Buy/Sell Agreement for the sale of Southland Company stock, the transfer of the proxies in the Association held by the Webb group and the Personal Service Agreement between Mr. and Mrs. Webb and the Lytton Financial Corporation resulted in a transfer of control of the Association from the Webb group to the Lytton group for which the Webb trust received $1,500,000.00 and Mr. and Mrs. Webb $300,000.00 to be paid over a five-year period.

The Association does not contend that the Webbs could not lawfully transfer the Southland Company, nor is that an issue here. But it is contended that part of the consideration purportedly paid therefor was attributable to transfer of proxies of the Association and effective control thereof; that does raise an issue here.

■ Substantial evidence was adduced at trial, and the Court finds, that virtually all of the earnings of Southland were derived from business referred to Southland by the Association. It appears that without the earnings so derived, the value of Southland stock could not reasonably exceed the book value of Southland's net assets. The Association introduced three alternative valuations of Southland as of the critical date of March 1961: (1) $155,000.00, the value of net assets held by Southland assuming no continued referral of business by the Association to Southland; (2) $223,000.00, assuming no continued referral of business by the Association but also assuming that the Association would not compete with Southland for business already held by Southland; and (3) $755,000.00,

assuming a continued referral of business by the Association to Southland after sale. The Court finds that the referral of satellite business is one of the incidents of control of the Association such that any part of the consideration paid to the Webbs therefor is an asset properly belonging to the Association and that the March 1961 transactions constituted an unlawful attempt by the Webbs to appropriate to themselves this asset. An issue here to be determined is the value attributable thereto. The Court finds the value of Southland on the critical date to be the sum of $155,000.00.

The Webb group argued that if it was not unlawful for the Webb trust to benefit by the referral of Association business to Southland during the period the Webb group was in control of the Association, which the Association conceded, then it cannot have been unlawful for the Webbs to have transferred the right to direct Association business. This facile argument ignores not only the established principle that a fiduciary is not permitted personal gain for the transfer of his fiduciary office or position but it also ignores the fact that the ultimate right to direct satellite business inures in the members of the Association whose deposits in and borrowings from the Association gave rise to the generation of the satellite business in the first instance. By the March 1961 transactions, the Webb group, in effect, transferred the right to direct satellite business without the consent of the Association's members and for a gain.

■ Though the Webb group denies that control of the Association was transferred for consideration by reason of the March 1961 transactions, and that no part of the consideration paid for the stock of Southland is allocable to transfer of control, they contend further that even if these transactions did amount to transfer of control, such transfer was not prohibited by any express regulation of the Board, and, indeed, the Board had permitted similar transfers prior to March 1961. This argument fails to

recognize, however, that the illegality of the March 1961 transactions is premised not upon violation of any express regulation of the Board or provision of the Act but arises from breach of the Webb group's common law duties of fair dealing, disclosure and trust which the Court deems are implicit in the Act and regulations.

The fact that the Board might have failed to enforce these duties in connection with the transfer of control of other federally chartered associations does not exonerate the Webb group's breach of trust though it may be an indictment of the Board and the laxity with which it has executed the broad statutory mandate of the Act to protect and promote the interests of depositors and borrowers of federally chartered savings and loan institutions. It is, of course, true as a general matter that long standing construction of a statute by the administering agency is entitled to great weight, Udall v. Tallman, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), rehearing denied 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965), F. T. C. v. Mandel Brothers, Inc., 359 U.S. 385, 79 S.Ct. 818, 3 L.Ed.2d 893 (1959). In the present case, the Webb group is relying not on an express construction by the Board that transfers of control for consideration are permissible but on the Board's purported failure to act. Without more, we cannot read into such inaction a positive meaning regarding the proper interpretation of the Act. *See*, WHDH, Inc. v. Federal Communications Commission, 118 U.S.App.D.C. 162, 334 F.2d 552 (D.C.Cir. 1970). Moreover, in the context of the present case, it cannot be said that the Webb group has been prejudiced by any past uncertainty in regard to the interpretation of the Act or the Board's regulations. The standard which the Association and Board assert the Webb group violated is not one enunciated *ex poste* by the Board. Instead, the standard is that commonly and traditionally applied to those persons who stand in a fiduciary position of trust and confidence. The Court has

no doubt that as officers and directors of the Association the members of the Webb group knew or, in any event, should have known that this is the standard by which their official acts were to be measured.

Finally, the Webb group argues that the March 1961 transactions in no way damaged the Association or impaired the claims of the Association's depositors. A like contention was aptly dealt with by Judge Friendly in Rosenfeld v. Black, *supra*, which held that the transfer for consideration of a mutual fund investment advisory firm to a successor adviser constituted a breach of the adviser's fiduciary duty to the fund and, in effect, the sale of an asset belonging to the fund:

> "It is wholly immaterial that the prospect of receiving future management fees if it had continued as an adviser would have been an asset of Lazard [the transferor adviser] rather than of the Fund; the same would be true of a trustee's right to receive future commissions or a corporate president's right to receive future salary and other benefits. Even ratification by the beneficiaries would not save a fiduciary from accountability for any amounts realized in dictating or influencing the choice of a successor unless this was secured with notice that the beneficiaries were entitled to the profit if they wished, *cf*, United Hotels Co. of America v. Mealey, 147 F.2d 816, 819 (2d Cir. 1945), and it is questionable whether even such ratification by a majority of the beneficiaries could bind others or the Fund itself . . . .
>
> \*     \*     \*     \*     \*     \*
>
> "It is understandable that, under 'the morals of the marketplace,' Lazard should see no reason why, having selected a competent adviser willing to serve on the same terms Lazard had done, it should not receive what the new incumbent was willing to pay for the opportunity. But equity imposes a higher standard. It is fitting to repeat Chief Judge Cardozo's familiar

words, 'Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary duties. . . . Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate.' Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928)." Rosenfeld v. Black, *supra*, at 1343–44.

Mr. Justice Cardozo's injunction is no less applicable here than in the sale of an investment advisory firm. Nor does the Court deem the application of *Rosenfeld* limited by the Ninth Circuit's holding in S. E. C. v. Insurance Securities, Inc., 254 F.2d 642 (9th Cir. 1958), cert. denied, 358 U.S. 823, 79 S.Ct. 38, 3 L. Ed.2d 64 (1958). The Court of Appeals held in that case that defendants' fiduciary responsibilities rested solely upon their advisory contract and that when control was transferred to a successor adviser, section 15(a)(4) of the Investment Company Act of 1940, 15 U.S.C. § 80a–15(a)(4) operated to terminate those responsibilities. The Ninth Circuit Court of Appeals has held in the present case that the Webb group's fiduciary duties are not similarly confined by the Home Owners Loan Act or other statutory enactment, Reich v. Webb, 336 F.2d 153, 158 (9th Cir. 1964), but embrace common law fiduciary duties as well as those expressly imposed by the Act. Moreover, *Insurance Securities* is distinguishable from *Rosenfeld* on the ground that *Insurance Securities* was a proceeding under section 36 of the Investment Company Act of 1940, 15 U.S. C. § 80a–35, which requires that the Securities & Exchange Commission prove "gross misconduct or gross abuse of trust." Rosenfeld v. Black, *supra*, at 1346. Recovery by the Association herein does not require so exacting a standard of proof.

The foregoing considers and disposes of the controlling issues in the case. The parties suggested the existence of issues of fact, forty-seven in number, and issues of law in the total number of thirty-five, to be litigated. All have been considered. Some mitigate the consequences of the breach of fiduciary duties which the Court has found.

The Webbs defend on the ground that their knowledge and belief of claimed lawfulness and absence of bad motive in their acts absolves them from liability; they contend that reliance on past policy of the Bank Board in similar situations makes proper their acts. The Court disposes of these contentions by finding the Webbs to be without bad motive and without intentional unlawfulness and at the same time determines such finding irrelevant to the determination that a breach of fiduciary duty occurred. The imposition of a constructive trust for the benefit of the Association upon the funds received and in the hands of Title Insurance and Trust Company is an appropriate remedy. Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955), Jones v. H. F. Ahmanson & Company, 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969).

The plaintiff seeks punitive and exemplary damages. Without determining that the law permits such recovery in this type of case, no such award is made against any defendant. *See*, California Civil Code, Section 3294 (1970).

A money judgment is sought against the Webb group defendants. No such award is made against any defendant. With some reservations the Court finds that the personal service agreement and covenant not to compete on the part of Marguerite R. Webb and Eugene Webb, Jr., while a concurrent part of the transaction with the transfer to Lytton group of control of the Association, may be deemed a separate transaction. As such the Court cannot strike it down, despite the inference fairly to be drawn, that the $300,000.00 consideration was excessive.

The sole appropriate remedy is a declaration that the consideration paid to the trustees by Lytton Financial Corporation allocable to a transfer of control of the Association is an asset held for its benefit in the hands of the trustees. Rule 19(b) of the Federal Rules of Civil Procedure provides for just such action in order to afford to the parties complete relief.

 The position in this litigation of the Federal Home Loan Bank Board is, technically, that of defendant counter-claimant and cross-complainant. Essentially, its position is the same as that of plaintiff except for its claim for fees and expenses. The Court considers that the equitable relief referred to above in favor of plaintiff and against the trustee defendants adequately vindicates the role of the Federal Home Loan Bank Board and affords all the relief to which it is entitled.

A question remains as to the proper reach of the Court's order against defendant Title Insurance and Trust Company. Its sole posture in the case is as co-trustee of the shares of Southland Company (and the proceeds of sale thereof and transmutations thereof) conveyed on May 29, 1958, by the Webbs. It is conceded that defendant Title Insurance and Trust Company, in accepting a conveyance of the trust assets and in their administration of the trust, has not acted in violation of any law, regulation of the Federal Home Loan Bank Board, or by-laws of the Association, and is entitled to retain all regular fees received in the administration of the trust. Indeed, the Title Insurance and Trust Company is a party defendant to the litigation solely for the purpose of facilitating any relief to which the plaintiff may be entitled.

The trust property is clearly traceable. It consists of the consideration received by the trustees from the Lytton group. 5 Scott, Law of Trusts §§ 507, 508.1 (1967).

Accordingly, the Court finds that plaintiff is entitled to judgment in its favor and against defendants Title Insurance and Trust Company and Marguerite R. Webb and Eugene Webb, Jr., as Trustees of the Webb Trust, declaring that they hold all the assets of the Webb Trust (less the sum of $155,000.-00) as constructive trustee for the benefit of plaintiff, less reasonable fees and expenses of its administration of said trust and costs and expenses of defending this litigation and directing the conveyance by said defendants as trustees to plaintiff of all such assets.

The Court retains jurisdiction for the purpose of determining and fixing the proper amount of such costs and expenses, on application so to do by any party in interest hereto.

The Court notes that the defendant Eugene Webb, Jr., has died and that Title Insurance and Trust Company, a corporation as executor of the will of Eugene Webb, Jr., has been substituted in his place as party defendant.

This Memorandum of Decision shall be regarded as the Court's Findings of Fact and Conclusions of Law. Pursuant to Local Rule 7, counsel for plaintiff will prepare, serve and lodge an appropriate form of judgment.